[No. S074414. Apr. 21, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
SAMUEL ZAMUDIO, Defendant and Appellant.

328

**COUNSEL**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Peter R. Silten, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanka, Assistant Attorney General, John R. Gorey and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CHIN, J.**—On November 17, 1997, a jury convicted defendant Samuel Zamudio of two counts of first degree murder (Pen. Code, §§ 187, subd. (a), 189)[1] and two counts of first degree residential robbery (§ 211). As to each of the convictions, the jury also found true allegations that defendant personally used a knife during the commission of the offense (§ 12022, subd. (b)). As to the murders, the jury also found true special circumstance allegations that defendant was convicted in this proceeding of more than one first degree murder (§ 190.2, subd. (a)(3)) and that the murders were committed while defendant was engaged in the commission of robbery (§ 190.2, subd. (a)(17)). On November 21, 1997, the jury fixed the penalty at death and, on October 5,

---

[1] All further unlabeled statutory references are to the Penal Code.

1998, the trial court imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).) For reasons that follow, we vacate one multiple-murder special-circumstance finding and otherwise affirm the guilt and penalty judgments in their entirety.

## I. FACTS

### A. *Guilt Phase*

On Sunday, February 11, 1996, the dead bodies of 79-year-old Elmer Benson and 74-year-old Gladys Benson were found in their home.[2] The evidence presented at trial established that defendant, who lived next door to, was friends with, occasionally did household chores for, and owed money to, the Bensons, stabbed them to death and stole their property.

### 1. *Prosecution Evidence*

Around 9:00 a.m., on February 11, firefighter/paramedics for the Los Angeles County Fire Department received a call to respond to the Bensons' home in South Gate. Inside, they found the dead bodies of Elmer and Gladys. They notified police and, around 11:37 a.m., homicide detectives responded to the scene to investigate. They found Gladys's body on the kitchen floor with numerous stab wounds, clad in a nightgown and robe that were raised above her waist, exposing her pubic area. Gladys was still wearing a bracelet, ring, and chain. Elmer's body, which also had numerous stab wounds, was on the living room floor near his wheelchair.[3] There was blood in the kitchen and living room, and nowhere else in the house. Bloody shoe prints on the kitchen floor near Gladys's body led out of the kitchen and into the living room to Elmer's body. There was fresh coffee in a pot near the sink and two cups had been poured; one was on a table in the living room near Elmer's wheelchair. A newspaper was on the front porch, and no lights were on inside (other than a hallway nightlight). Based on these circumstances, Los Angeles County Deputy Sheriff Donald Garcia, who was assigned to the homicide bureau's detective division and who participated in the investigation, opined that the murders occurred "at first light, approximately 6:00 to 6:30 in the morning." The coroner placed the time of death at 7:00 a.m., plus or minus three or four hours.

South Gate Police Officer Dave Scott arrived at the Bensons' home earlier that morning—approximately 9:30 or 9:45 a.m.—and was told to maintain

---

[2] For simplicity and to minimize confusion, we will generally refer to the victims by their first names. All further dates are to the year 1996 unless otherwise indicated.

[3] Elmer, who had suffered a stroke and had difficulty walking, sometimes used a wheelchair and a walker.

the outside perimeter of the crime scene. Shortly after arriving, he interviewed Jacqueline Zamudio, who is defendant's daughter and who first discovered the Bensons' bodies, and Ivan Zalapa, who is defendant's nephew and who made the 911 call. During the interview with Jacqueline, defendant, who lived next door to the Bensons in his brother-in-law's house, walked up and began interjecting comments. He repeatedly said he was good friends with, and close to, the Bensons. He also said he often did favors for them and repaired things around their house. While listening to defendant, Scott received a dispatch to call the station, and asked if he could use defendant's telephone. Defendant invited Scott into his living room to make the call. While Scott was dialing, defendant again commented that he was close to the Bensons. He also stated he had recently borrowed $100 from them, was supposed to repay the loan within two weeks, gave the Bensons the "pink slip" to his car as collateral, and believed the title document was still in the Bensons' house. After Scott finished his telephone call, defendant took Scott to the kitchen, showed him a calendar with a big "X" on February 21, and said the "X" was a reminder that the loan was due by February 22.

Shortly before noon, Sergeant Martin van Lierop of the South Gate Police Department, who was assigned to the detective bureau, arrived at the Bensons' house and began investigating the crime scene.[4] Later, he and Los Angeles County Deputy Sheriff Timothy Miley, who was assigned to the homicide bureau's detective division, canvassed the neighborhood for witnesses. They asked defendant, Jacqueline, and Ivan to come to the South Gate police station for interviews as potential witnesses and to provide background information on the victims. Defendant, Jacqueline, and Ivan agreed, and were transported to the station, which was only two blocks away. During his interview, defendant said he never left his house the previous night, left around 5:00 or 6:00 a.m. that Sunday morning to visit a friend, and returned around 10:00 a.m. He also stated he was last in the Bensons' home the previous Thursday, February 8, when he fixed their washing machine, changed the oil in their truck, and ate breakfast with them. He also talked about the $100 loan, explaining that he (1) borrowed the money on February 8 because he was not working, had no money, and did not want to ask his wife for money, (2) gave the Bensons the "pink slip" to his car as collateral, (3) was supposed to repay the loan by February 22, and (4) did not want his wife to know about the loan.

After the interview, Miley and van Lierop returned to the crime scene, searched for evidence, and spoke with other members of defendant's family. As a result of their conversation with defendant's wife, Maria Barron, they had more questions for defendant, so they returned to the station and reinterviewed him.

---

[4] At the time of trial, van Lierop was a lieutenant.

During his second interview, defendant gave the following, different account of his whereabouts: He left his house around 7:00 p.m. on Saturday and drove to the El Paraiso bar in Los Angeles, where he stayed until closing at 2:00 a.m. on Sunday morning and spent all of his money buying alcohol for himself and others. After closing, he drove two women who worked at the bar—including one named Sarahi whom he had been seeing for awhile—to their homes. He returned home around 3:00 or 3:30 a.m., unsuccessfully tried to sleep, and again left his house between 5:00 and 5:30 a.m., to visit a friend, Juan Ledesma. Ledesma was not home, so defendant spoke with Ledesma's mother. He then went to the garment district in downtown Los Angeles and just walked around (because the stores were not open). He returned home again around 10:00 a.m.

At the end of the second interview, Miley asked if he could look at defendant's shoes. Defendant removed his shoes and gave them to Miley. The officers found what they believed to be "unique . . . zigzag patterns" on the soles and heels. Miley photographed defendant holding the shoes and put them in a bag. The officers then asked defendant what he had been wearing the previous night. Defendant replied that he was still wearing the same pants, but that the shirt he had been wearing was at his house.

Miley and van Lierop then took defendant and the bag with his shoes back to the crime scene. Defendant went inside his house with van Lierop, retrieved a shirt that was hanging on his bedpost in his bedroom and gave it, along with the pants he was wearing, to van Lierop. Meanwhile, Miley took defendant's shoes to the Bensons' home and showed them to Stephan Schliebe, a criminalist with the Los Angeles County Sheriff's Department. Schliebe observed that the general pattern on the soles of the shoes was similar to the pattern of the bloody shoe prints on the Bensons' kitchen floor. The shoes tested positive for blood, and the officers were advised of this result. Schliebe later compared exemplar shoe prints from the shoes to life-size enlargements of photographs of the bloody shoe prints on the Bensons' kitchen floor. He testified at trial that two of the bloody shoe prints were made by defendant's left shoe "to the exclusion of all other shoes."

Van Lierop then took defendant to the police station and arrested him. He retained a watch and a ring defendant was wearing, all of the clothes defendant was wearing, including his socks, and approximately 40 coins found in defendant's pocket. Many of the coins were from the 1960's and the 1940's, including a 1942 Mercury head dime, a 1947 dime, and a 1944 nickel. During a search of the Bensons' house, police found three old coins—a 1944 Mercury head dime, a 1963 penny, and a 1968 penny—on Gladys's partially made bed. Micki Downey, the Bensons' daughter, testified that the Bensons collected old coins from the 1960's and earlier. Downey also

testified that after the murders, family members went through the Bensons' belongings, but were unable to find a number of old coins they expected to find. Linda Bouffard, Gladys's daughter and Elmer's stepdaughter, testified that in the mid-1960's, when she worked in a bank, Elmer started collecting coins—including old dimes, nickels, and pennies—and, "for about a week," gave her $20 every morning and asked her to bring back a roll of quarters and two rolls of dimes. She also testified that after the murders, she and other family members searched the Bensons' house for the money, but were unable to find all of the quarters.

Gisele LaVigne, a senior criminalist with the Los Angeles County Sheriff's Department, tested the items taken from defendant for blood. She found blood on "a lot of areas of" the shoes, including the shoelaces, tops and sides, and inside grooves on the sole of the left shoe. Through serological testing, she determined that a bloodstain on the instep of the left shoe contained genetic markers consistent with Gladys's blood, and she calculated that only 13 out of 10,000 people have that particular combination of genetic markers. She also found blood on defendant's ring, watch and sock. Subsequent testing at the Serological Research Institute in Northern California showed that the genetic profile of the blood on defendant's watch matched that of Gladys, and that only one in 4 million people has that genetic profile.

Police investigators found defendant's palm print on the doorframe between the Bensons' living room and kitchen, and found his fingerprint on a flashlight on a table in the Bensons' service porch. They also talked with Ledesma's mother, who confirmed that defendant had come by her house on February 11, but gave a time for the visit that was three hours different from the time defendant had stated.

Autopsies showed that Elmer and Gladys died of multiple stab wounds. They both had stab wounds to the throat and multiple stab wounds in the chest near the heart. More specifically, Gladys had what was described as a "fatal" wound to her abdomen; two wounds to her left chest; a "fatal" wound to her left chest that broke a rib and punctured a lung twice, indicating the knife had been thrust two times through the same wound; two "slash" wounds to her neck, one of which was "potentially fatal"; five shallow "defense-type" wounds to her fingers and wrists; diagonal, "shallow," "slash type" wounds across her neck; and a "fatal" wound to her upper left back that entered her chest and injured her aorta. There was a small tear on her lip, and bruises and abrasions on her left arm, her head above her eyebrow, and her pelvis. Elmer had two shallow wounds to his throat; a "fatal" wound to his left chest that broke a rib and wounded a lung; a "fatal" stab wound to his left chest that entered his heart and broke a rib; and two wounds to his chest. The fatal stab wound to his heart was three and one-half inches deep and

five-eighths of an inch wide. Elmer also had defensive wounds on his right hand and wrists, and bruising on his right forearm.

After the murders, the Bensons' children and other family members went through the Bensons' house and belongings, checking for missing items. As previously noted, they did not find all of the coins they expected to find. They also did not find Gladys's wallet, checkbook, and credit cards, which Gladys kept in her purse, the "pink slips" for some of the Bensons' vehicles, or the envelope in which the Bensons kept those pink slips, which was marked "DMV" or "pink slips" and kept in an organizer on a desk. They did, however, find the pink slip to Gladys's Jeep Cherokee in a dresser in Gladys's bedroom, and the pink slip to defendant's car in an envelope at the back of the Bensons' file organizer. Also found were antique and other coins, several thousand dollars in cash hidden throughout the Bensons' house, jewelry in Gladys's bedroom, Elmer's wallet containing credit cards and a $100 bill in a tray near the kitchen door, and firearms throughout the house. Gladys's missing credit cards were never used after the murders.

Marta Contreras, a paralegal supervisor with the Los Angeles County Public Defender, interviewed Sarahi Aleman, who was one of the employees of the El Paraiso bar whom defendant drove home on the morning of February 11. Contreras testified that, during the interview, Aleman discussed conversations she had had with defendant's wife, Maria, after defendant's arrest. According to Contreras, Sarahi stated during the interview that Maria told her an extensive relationship between defendant and another woman had placed a great strain on their marriage, and that financial difficulties had caused other marital problems.

2. *Defense Evidence*

Family members and former coworkers testified regarding the circumstances of defendant's life, including his early years in Mexico, his parents' separation, the four-to-five-year period he lived with his aunt after his mother moved to Los Angeles, his move to Los Angeles to be reunited with his mother, his mother's remarriage, his own marriage and the birth of his two daughters, his work in Mexico as a police officer, his employment, and his various residences over the years. Friends, family members, and former coworkers also testified that defendant had never been violent or aggressive, is peaceful and honest, respects the property rights of others, and is a good husband and father. Defendant offered numerous documents from Mexico indicating he had no criminal record there.

Several defense witnesses testified about defendant's relationship with the Bensons. Defendant first moved next door to the Bensons in 1990. He lived

there until early 1995, when he moved to New Mexico. He moved back to the house next to the Bensons in late 1995 or January 1996. Defendant and his family had a very friendly relationship with the Bensons. Defendant's daughter Jacqueline was especially close to them; they treated her like a granddaughter, and she called them her grandparents. Defendant frequently helped them without pay—fixing appliances, doing yard work, servicing their vehicles—and had been welcome in their home "[s]ince 1990, up to the date when" the crimes occurred. Defendant went to the Bensons' house "all the time," and once visited Elmer in the hospital. Elmer often visited defendant's house, and defendant's family invited the Bensons to family gatherings.

Defendant's wife, Maria Barron, testified that on Saturday, February 10, defendant left the house between 8:30 and 9:00 p.m. to meet a friend, Jose Garcia, and play pool. He returned home around 4:00 a.m.—she was not sure of the time—and lay down next to her fully dressed. He arose again around 6:30 or 7:00 a.m., and told her he was going to see his friend Juan. Around 8:00 a.m., Jacqueline went to the Bensons' house to borrow a typewriter. She came back crying and screaming, and said Elmer had something red on his chest. Maria, Jacqueline, Ivan and others went to the Bensons' house to investigate. Ivan called police, and paramedics arrived around 9:00 a.m. Around 9:30 or 10:00 a.m., while Maria was watching the events from her front porch, defendant returned, still wearing the same clothes he had been wearing the previous night. Defendant said he was cold, so Maria gave him a sweater, took the shirt he was wearing, and put it on a bunk bed inside their house. She never saw any blood on defendant's clothing or shoes. She knew defendant had borrowed $100 from the Bensons, and said he was scheduled to receive a $2,403 income tax refund. She also said her family collected all kinds of coins and that defendant carried old coins because of her "belief that if you have an old coin, then you will never lack any money, so we would always have plenty of money." She brought a 1941 Mercury head dime to court and said she had "a lot more at home."

Sarahi Aleman testified that when she arrived for work at the El Paraiso bar at 9:00 p.m. on February 10, defendant was already at the bar sitting by himself with a bucket of beers. When the bar closed, defendant drove her and two other bar employees to their respective homes. Defendant had a six-pack of beer in the car and asked Sarahi if he could drink some of the beers in her house. She invited him in and he drank three beers while inside. He left sometime after 3:30 a.m., offering to give her a ride home the following day. Aleman denied that Maria had told her about any extramarital affair or other marital or financial difficulties involving defendant, and did not remember saying anything about these subjects to Contreras, the public defender's paralegal supervisor.

Jose Garcia testified he went to the El Paraiso bar on February 10 between 11:30 p.m. and midnight and saw defendant, whom he had known for three or four years, sitting alone drinking a beer. They spent the evening talking, drinking beer, and playing pool. Defendant appeared to be in a pleasant mood and nothing seemed to be bothering him. He did not appear intoxicated. At closing time, defendant waited for Sarahi, and Jose waited for another female bar employee. After the women arrived, Jose and defendant went their separate ways.

### B. *Penalty Phase*

#### 1. *Prosecution Evidence*

The prosecution played a 14-minute videotaped montage of still photographs depicting the Bensons' lives. While the videotape played, Linda Bouffard testified about what the photographs depicted. She also testified about how she learned of, and was affected by, her parents' murders. Micki Downey testified about how she learned of her parents' murders and how their deaths affected her and her two children. Two of the Bensons' grandchildren testified about their memories of the Bensons, how they learned of the murders, and how the murders affected them and their families.

#### 2. *Defense Evidence*

Janett and Jacqueline Zamudio, defendant's daughters, testified that during the two years defendant had been in jail, he stayed in touch with his family by telephone and letter. He sent them drawings and letters, gave them advice, and encouraged them to do well in school. Jacqueline read many of defendant's letters to his family and described the accompanying drawings. She also testified she had done well in school and that teachers had called her an excellent, exceptional, and outstanding student.

## II. DISCUSSION

### A. *Guilt Phase Issues*

#### 1. *Denial of Defendant's Motion to Suppress*

Before trial, defendant moved under section 1538.5 to suppress the shoes, pants, shirt, socks, watch, ring, and coins the police collected from him, and all fruits of that evidence, i.e., all of his statements to the police. He argued that any consent he gave to police to examine his shoes was the product of unlawful police detention and that the other items were all discovered as a result of that unlawful detention. The trial court denied the motion, finding

that although defendant "may have been a suspect" when he allowed the police to examine his shoes, "[t]here was not a custodial or a coercive environment," "defendant was not in custody," and he "freely and voluntarily" gave his shoes to police. Defendant argues the trial court erred in denying his motion.

■ Where, as here, the prosecution relies on consent to justify a warrantless search or seizure, it bears the "burden of proving that the defendant's manifestation of consent was the product of his free will and not a mere submission to an express or implied assertion of authority. [Citation.]" (*People v. James* (1977) 19 Cal.3d 99, 106 [137 Cal.Rptr. 447, 561 P.2d 1135].) Consent that is the product of an illegal detention is not voluntary and is ineffective to justify a search or seizure. (*Florida v. Royer* (1983) 460 U.S. 491, 507–508 [75 L.Ed.2d 229, 103 S.Ct. 1319] (plur. opn. of White, J.); *Wilson v. Superior Court* (1983) 34 Cal.3d 777, 790–791 [195 Cal.Rptr. 671, 670 P.2d 325] (*Wilson*); *People v. Shields* (1988) 205 Cal.App.3d 1065, 1073–1074 [252 Cal.Rptr. 849].) Where an illegal detention occurs, unless "subsequent events adequately dispel the coercive taint of the initial illegality, i.e., where there is no longer causality, the subsequent consent is" ineffective. (*People v. $48,715 United States Currency* (1997) 58 Cal.App.4th 1507, 1514 [68 Cal.Rptr.2d 829]; see also *Wilson, supra,* at p. 791, fn. 12.)

■ Under these principles, the threshold issue here is whether defendant was detained when he gave consent. As the United States Supreme Court has explained: " '[N]ot all personal intercourse between policemen and citizens involves "seizures" of persons.' " (*Florida v. Bostick* (1991) 501 U.S. 429, 434 [115 L.Ed.2d 389, 111 S.Ct. 2382].) In this context, a seizure occurs only "when the officer, ' "by means of physical force or show of authority," ' terminates or restrains [a person's] freedom of movement [citation] *'through means intentionally applied . . .'* [citation]." (*Brendlin v. California* (2007) 551 U.S. 249, 254 [168 L.Ed.2d 132, 127 S.Ct. 2400, 2405].) The dispositive question is whether, " 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave . . .' [citation]." (*Id.* at p. 255 [127 S.Ct. at p. 2405].) "[W]hen a person 'has no desire to leave' for reasons unrelated to the police presence, the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter . . .' [citations]." (*Id.* at p. 255 [127 S.Ct. at pp. 2405–2406].) The test is "objective," not subjective; it looks to "the intent of the police as objectively manifested" to the person confronted. (*Id.* at p. 260 [127 S.Ct. at p. 2408].) Accordingly, an "officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant . . . ." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821 [66 Cal.Rptr.2d 701, 941 P.2d 880].)

Whether a seizure occurred within the meaning of the Fourth Amendment is a mixed question of law and fact qualifying for independent review. (Cf. *Thompson v. Keohane* (1995) 516 U.S. 99, 102 [133 L.Ed.2d 383, 116 S.Ct. 457] [whether a suspect is " 'in custody' " for purposes of the Fifth Amendment is a mixed question of law and fact qualifying for independent review]; *People v. Holloway* (2004) 33 Cal.4th 96, 120 [14 Cal.Rptr.3d 212, 91 P.3d 164] [same].) Accordingly, "we review the trial court's findings of historical fact under the deferential substantial evidence standard, but decide the ultimate constitutional question independently. [Citations.]" (*Holloway, supra,* at p. 120.) We must accept factual inferences in favor of the trial court's ruling. (*People v. Stansbury* (1995) 9 Cal.4th 824, 831 [38 Cal.Rptr.2d 394, 889 P.2d 588].) If there is conflicting testimony, we must accept the trial court's resolution of disputed facts and inferences, its evaluations of credibility, and the version of events most favorable to the People, to the extent the record supports them. (*Ibid.; People v. Boyer* (1989) 48 Cal.3d 247, 263 [256 Cal.Rptr. 96, 768 P.2d 610].)

Applying this standard of review and based on the testimony at the suppression hearing, at which defendant testified, we reject defendant's claim that his consent to police examination of his shoes was the product of unlawful police detention. A little before 1:30 p.m. on February 11, after examining the crime scene, Detective van Lierop went to the house next door and approached defendant and other members of his family, who were standing outside on the front porch. According to van Lierop, after identifying himself and showing his badge, he "asked" if defendant, his daughter Jacqueline, and his nephew Ivan, would go to the South Gate police station to be interviewed as potential witnesses and to provide background information on the victims. Van Lierop said "something to the effect that [the officers] would like Ivan and . . . Jacqueline and also [defendant] to accompany [the officers] to the police station so [they] can ask them questions pertaining to the Bensons' habits and any other information that they may have pertaining to the Bensons." Defendant confirmed that van Lierop informed him the police wanted to talk to him "as a potential witness, not as a suspect." Defendant also testified he "believed" van Lierop at the time. According to van Lierop, defendant "was very willing" to go to the station and did not object to the request "in any way or show any hesitation or any unwillingness." Defendant confirmed that he did not indicate he did not want to go to the station, and stated he "said yes" when the police told him they wanted him to come with them "as a potential witness."

Approximately 1:30 p.m., one uniformed patrol officer, with gun and badge visible, drove defendant, Jacqueline, and Ivan two blocks to the police station in a marked police car. They all sat in the backseat; no one was handcuffed or patted down for weapons. There was no cage between the car's front and back seats, but the car's back doors could not be opened from inside (as was

the case with all of the department's cars). Defendant testified he "didn't feel [he was] in custody when [he was] taken in the police car" to the station.

Van Lierop testified that at the station, defendant, Jacqueline, and Ivan were put together in a "break" or "conference room directly adjacent to the main part of the detective bureau," which contained a long table inside with about eight chairs, a refrigerator, and a coffeepot, and which was "attached or directly adjacent to" restrooms. Each was then separately interviewed by van Lierop and Miley in an "interview room" approximately "10-by-10" and containing "a small table and about 4 or 5 chairs." The interview room was not in "the jail part of the police station," but was "attached to the opposite end of the main part of the detective bureau" in "a nonsecure area" where "the detectives do their normal daily duties." As each was questioned in the interview room, the other two waited together in the conference room. An officer was assigned to the conference room area. According to van Lierop and Miley, the officer was assigned to the area, not to ensure that defendant, Jacqueline, and Ivan did not leave, but to assist them in the event they needed anything and to keep them from nosing around the police department. Van Lierop did not know whether the officer actually sat in the conference room; defendant testified the officer was "always . . . guarding the door." At no point was defendant handcuffed, and he was allowed to use the bathroom when he asked.

Jacqueline and Ivan were interviewed first, each for 20 minutes or less. Defendant was then interviewed for 20 or 25 minutes, beginning about 2:20 p.m. He was not advised of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]), and was instead told by Miley "he was not under arrest" or "in custody" and "it was not an interrogation." According to van Lierop, the questioning was not "hostile or menacing in any fashion." Miley similarly testified that no accusations were made against defendant. During the interview, defendant did not in any way suggest he was involved in the crime, and he "generally" provided "background information . . . about how he knew the victims, what he knew about them, when he'[d] seen them, that sort of thing." He also gave an account of his activities during the relevant timeframe. At the detectives' request, defendant also gave them permission to return to his residence to look for shoes matching the shoe prints on the floor of the Bensons' house.

After the interview, defendant returned to the conference room where Jacqueline and Ivan were waiting. They waited there while van Lierop and Miley returned to defendant's residence. Defendant asked to make a telephone call and, about 20 minutes later, was allowed to make the call.

The officers did not find any matching shoes at defendant's residence. They did, however, interview defendant's wife, and she gave them information

about defendant's activities during the previous day that did not match the information defendant had given.

The officers returned to the station and, shortly after 4:00 p.m., again talked with defendant, this time in the large conference room. Defendant was not given his *Miranda* rights and the interview was not recorded because, according to Miley, defendant "was still considered a witness" and department policy was not to "tape-record witnesses." According to van Lierop, Miley told defendant he was not in custody, and defendant said "he wanted to help any way he could." Miley testified that no accusations were made against defendant during the second interview, but both officers testified they told defendant about the discrepancies between his statements and his wife's. In response, defendant amended his prior statement regarding his activities but did not indicate in any way he had participated in the murders.

According to Miley, he then asked defendant, "do you mind if I look at your shoes?" According to van Lierop, defendant "said sure," and "something to the effect that we could certainly look at his shoes if it would help in the investigation." According to Miley, defendant said something like, "No, help yourself." Both officers testified that defendant then reached down, removed his shoes, and gave them to Miley. Miley testified that defendant did so "almost energetically." Defendant testified that when the officers asked for his shoes, he "said yes" and gave them his shoes. He also testified he "had no reason" not to want to give them his shoes, he "didn't mind" and "didn't care," and although the officers used a "tone of voice like it's an order," they did not threaten him or act "mean" towards him.

In view of all of the circumstances, we conclude that before giving the officers his shoes, defendant was not detained within meaning of the Fourth Amendment. The evidence in the record supports the conclusion that there was no threat or application of force, no intimidating movement, no brandishing of weapons, no blocking of exits, and no command associated with the officers' request that defendant come to the police station. (See *United States v. Drayton* (2002) 536 U.S. 194, 204 [153 L.Ed.2d 242, 122 S.Ct. 2105].) Defendant was not taken to the station alone; he was accompanied by his daughter and nephew. All three were told the police wanted to speak with them as potential witnesses, not as suspects, and none of them was ever patted down for weapons or handcuffed. As noted above, defendant himself testified he "didn't feel [he was] in custody when [he was] taken in the police car" to the station. At the station, defendant was left waiting in a large conference room in a nonsecure area with various accessible amenities (bathroom, refrigerator, coffeepot) while his daughter and nephew were interviewed. Before his first interview, defendant was not given his *Miranda* rights, and was instead told that he was not under arrest, that he was not in

custody, and that the interview was not an interrogation. The questioning, which lasted no more than 25 minutes, was not at all hostile, menacing, or accusatory. With defendant's permission, the officers returned to defendant's residence to look for evidence. While they were gone, defendant waited in an nonsecure conference room and was allowed, upon his request, to make a telephone call. When the officers returned to continue the interview about an hour and a half later,[5] they again told defendant he was not in custody, and defendant said "he wanted to help any way he could." Although the officers told defendant about the discrepancies between his statements and his wife's, they did not make accusations against him. According to defendant's own testimony, when the officers asked if they could look at his shoes, they did not threaten him or act "mean" towards him. Given these circumstances, a reasonable person in defendant's situation would not have believed he or she was not free to leave, to decline the officers' requests, or to otherwise terminate the encounter.

In arguing otherwise, defendant relies heavily on his view that "from the very beginning" of the investigation, the officers saw him as "a prime suspect." Defendant's view is not consistent with the officers' testimony regarding the point at which, or the extent to which, they considered him a suspect. Moreover, aside from issues of testimonial credibility, an officer's "beliefs concerning the potential culpability of the individual being questioned" are relevant to determining whether a seizure occurred "only if" those beliefs "were somehow manifested to the individual" being interviewed—"by word or deed"—and "would have affected how a reasonable person in that position would perceive his or her freedom to leave." (*Stansbury v. California* (1994) 511 U.S. 318, 325 [128 L.Ed.2d 293, 114 S.Ct. 1526].) Indeed, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the . . . issue, for some suspects are free to come and go until the police decide to make an arrest. The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case." (*Ibid.*) According to the record here, before being given defendant's shoes, the officers made no statement indicating they viewed defendant as a suspect, let alone a prime suspect. And, although they told defendant of discrepancies between his statement and his wife's, immediately before doing so they again informed him he was not in custody. On this record, defendant's reliance on the officers' supposed view of his role in the crime is unavailing.

---

[5] Based on his own testimony at the suppression hearing, defendant asserts he waited "about three hours" for van Lierop and Miley to return for the second interview. The trial court could reasonably find that the time period was as little as an hour and a half, based on van Lierop's testimony at the suppression hearing that the first interview began about 2:20 p.m. and lasted 20 or 25 minutes, and that the second interview began shortly after 4:00 p.m.

Other circumstances on which defendant relies are also unpersuasive. Defendant notes the officers had badges and weapons and were wearing uniforms. However, the high court has held that these factors "have little weight in the analysis" for determining whether a seizure occurred. (*United States v. Drayton, supra,* 536 U.S. at p. 204.) Defendant also notes that an officer was stationed in or around the conference room where he waited and was interviewed the second time. However, van Lierop and Miley testified that the officer was assigned to the area not to ensure that defendant, Jacqueline, and Ivan did not leave, but to assist them in the event they needed anything and to keep them from nosing around the police department. Nothing in defendant's testimony suggests the officer did anything to make defendant, who was expressly told he was not in custody and was not under arrest, believe the officer would have prevented defendant from leaving.[6] Notably, in several cases, the high court has rejected reliance on analogous circumstances in finding no seizure under the Fourth Amendment. (See *Drayton, supra,* at pp. 198–205 [no seizure where police officer displaying a badge and carrying a concealed weapon knelt on driver's seat of bus and faced the passengers while two other officers questioned the passengers without informing them of their right to refuse to cooperate]; *INS v. Delgado* (1984) 466 U.S. 210, 212–219 [80 L.Ed.2d 247, 104 S.Ct. 1758] [no seizure where armed agents displaying badges were stationed at factory exits while other agents walked around inside questioning workers without informing them they were free to leave].) Finally, defendant also notes that the officers never told him he did not have to talk or go with them, or that he was free to leave. However, the high court has "rejected . . . the suggestion that police officers must always inform citizens of their right to refuse" police requests. (*United States v. Drayton, supra,* 536 U.S. at p. 206.) No "presumption of invalidity attaches if a citizen consented without explicit notification that he or she was free to refuse to cooperate." (*Id.* at p. 207.) Although the officers here did not expressly inform defendant of his right to refuse their requests, they did advise him he was not under arrest and was not in custody, they did request permission to examine his shoes, and the totality of the circumstances indicates his consent was voluntary.[7]

---

[6] Defendant testified that the officer was "just standing around."

[7] Defendant also relies on the "tone of the officers' voices." He testified at the suppression hearing that when the officers asked to examine his shoes, they used a "tone of voice like it's an order." Of course, on this factual issue, it was for the trial court to judge the witnesses' credibility; on appeal, all presumptions favor the exercise of that power and we must uphold the trial court's credibility findings, both express and or implied, if substantial evidence supports them. (*People v. Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) On the record here, the trial court was not required to believe defendant's vague and conclusory testimony regarding the officers' tone of voice. As for defendant's repeated assertions that "he took" the officers' requests as "command[s]" and "felt [he] had no choice" but to comply, as earlier noted, defendant's subjective beliefs are irrelevant.

### 2. *Excusing Juror for Cause*

Defendant asserts the trial court committed reversible error and violated his constitutional rights in excusing Juror No. 8812 during trial over his objection. For reasons set forth below, we reject the claim.[8]

On the morning of November 3, 1997, the trial court called counsel into chambers and stated: "There has been an issue raised with the bailiff, Juror Number [8812]. And we'll see what his problem is." The following exchange then occurred between the court and the juror:

"The Court: Okay. Yes, sir, good morning, sir.

"Juror No. 8812: Good morning, Judge.

"The Court: Sit down. How are you today?

"Juror No. 8812: Good.

"The Court: Good, good.

"Juror No. 8812: I've got a problem. My dad had an operation about 3 weeks ago. And yesterday he decided to stop treatment. And I don't know if that's going to pose a problem. We were told that he—he had a kidney dialysis before. And the doctor said that he might have two days, a couple weeks. And, you know, I don't know if that's going to pose a problem as far as—

"The Court: Well, I mean, the problem is we want to accommodate you, obviously. This is your father, you say, right?

"Juror No. 8812: Yes.

---

[8] In this argument, and in other arguments we later address, defendant contends the error he is asserting violated one or more of his constitutional rights. Insofar as he failed in the trial court to make the constitutional claims he raises on appeal, those claims are forfeited except to the extent (1) they are "of a kind . . . that required no trial court action by the defendant to preserve [them], or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. . . . [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581] (*Boyer*).)

"The Court: And obviously it would be a distraction for you. I would assume, worrying about your father. Where is he, by the way?

"Juror No. 8812: In San Diego.

"The Court: San Diego? Okay. I gather you want to get down to see him and be with him?

"Juror No. 8812: We were there yesterday. And basically they accepted what his wishes was [sic]. But—

"The Court: It's just a question of time, in other words, you're saying?

"Juror No. 8812: Yes.

"The Court: Okay.

"[Defense Counsel]: I have no questions.

"[The Prosecution]: I have no questions.

"The Court: Okay. We're going to talk it over, and I'm going to let you go back in. And I'll let you know. Thank you very much."

In an ensuing discussion, the court expressed "concern" about "whether or not [Juror No. 8812] would be able to concentrate on this trial, particularly if his father is" dying. The court explained: "I don't think we're going to have a very receptive juror. He did indicate—I think the bottom line is that he does want to get down there with him. Based upon what he told me, I'll find good cause, all right." The prosecution then interjected: "For the record, this gentleman had expressed some sort of hardship earlier. And I remember he was one that said he didn't think he could stay the length of the trial. The record will reflect what the nature of the hardship was. But one other time he asked to be excused, at least my understanding is he had problems." The court responded: "But I am finding good cause based upon the father— medical authorities indicating to him there's nothing they can do, and the having at most two weeks. And I got the impression that this juror was obviously visibly concerned by the condition of his father. So I'm going to find good cause and excuse this juror." Defense counsel then stated: "I object to that. I do not feel good cause was shown. The father is about 125 miles away. . . . And it's really uncertain when the father will die. So based upon everything, I do not feel good cause was shown." Back in open court, without the jury present, the court stated: "We were notified by the bailiff this morning that Juror Number [8812] had a personal family problem. We

conducted a hearing in chambers regarding that problem . . . . And based upon what was heard in chambers, the court did make a finding of good cause over the objection of defense counsel . . . ." The court then identified the replacement juror.

■ Under section 1089, a court may discharge a juror who, "upon . . . good cause shown to the court is found unable to perform his or her duty . . . ." We review a trial court's decision to discharge a juror for good cause "for abuse of discretion. [Citations.] The juror's inability to perform the functions of a juror must appear in the record as a 'demonstrable reality' and will not be presumed. [Citation.] The trial court's finding [that] 'good cause' exists will be upheld on appeal if substantial evidence supports it. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1158 [40 Cal.Rptr.3d 118, 129 P.3d 321].)

We reject defendant's claim that the trial court abused its discretion when it found good cause to discharge Juror No. 8812. "We have in the past rejected similar claims in similar circumstances. (See *People v. Cunningham* [(2001) 25 Cal.4th 926,] 1028–1030 [108 Cal.Rptr.2d 291, 25 P.3d 519] [juror's father near death after suffering stroke]; *People v. Ashmus* [(1991) 54 Cal.3d 932,] 986–987 [2 Cal.Rptr.2d 112, 820 P.2d 214] [death of juror's mother]; *In re Mendes* (1979) 23 Cal.3d 847, 852 [153 Cal.Rptr. 831, 592 P.2d 318] [death of juror's brother].)" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1409–1410 [58 Cal.Rptr.3d 368, 157 P.3d 973] (*Leonard*) [death of juror's father-in-law].) In arguing otherwise, defendant emphasizes that Juror No. 8812 never asked to be discharged. However, in cases involving the death or impending death of a juror's relative, we have rejected the view that a specific request for discharge is necessary to establish good cause; "no such request is required. [Citation.]" (*Leonard, supra,* at p. 1410.) Defendant also asserts that, "[b]ecause the court cut Juror No. 8812 off when he tried to say what [his] 'problem' might be," the "record is silent" as to whether Juror No. 8812 needed or wanted to be with his father and could continue serving, and improperly "engaged in speculation when it assumed that Juror No. 8812's father's condition" would be a distraction. However, a juror's "behavior and demeanor [may] suppl[y] substantial evidence . . ." of good cause for discharge. (*People v. Lucas* (1995) 12 Cal.4th 415, 489 [48 Cal.Rptr.2d 525, 907 P.2d 373].) Here, as the People argue, that Juror No. 8812 brought this issue to the court's attention by notifying the bailiff he had a personal family problem is evidence his father's impending death would likely affect his ability to serve. Also supporting this conclusion is the court's observation on the record that Juror No. 8812 "was obviously visibly concerned by the

condition of his father."[9] Although it may have aided our review had the court questioned Juror No. 8812 regarding his state of mind or had he affirmatively stated on the record his ability and willingness, or lack thereof, "such inquiry . . . is not required." (*People v. Beeler* (1995) 9 Cal.4th 953, 989 [39 Cal.Rptr.2d 607, 891 P.2d 153].) On this record, no abuse of discretion appears.

### 3. *Admitting Linda Bouffard's Testimony*

The prosecution's theory of robbery, robbery felony murder, and the robbery special circumstance depended in part on the taking during the homicides of Gladys's wallet containing money, checks and credit cards. Apparently to establish that the wallet was in the Bensons' home at the time of the crimes, the prosecution asked Linda Bouffard whether her mother, Gladys, ever said anything "about her wallet being taken or stolen or lost or anything like that." Defense counsel objected that the question "call[ed] for hearsay," and the court responded: "I think if it is, it's an exception, perhaps, under a spontaneous declaration. Overruled." Defense counsel made similar hearsay objections, which the trial court also overruled, when the prosecution followed up by asking whether Gladys ever said her credit cards or checks had been stolen or taken or "anything like that." Bouffard answered "no" to all of these questions. On appeal, defendant asserts this testimony was hearsay and its admission was both error under the Evidence Code and a violation of his constitutional rights.

■ We reject defendant's argument because, as the People assert, the evidence was not hearsay. " 'Hearsay evidence' is evidence *of a statement that was made* other than by a witness while testifying at the hearing and that is offered to prove the truth of *the matter stated.*" (Evid. Code, § 1200, subd. (a), italics added.) Defendant is arguing that Gladys's failure to say anything about the items being missing or taken—i.e., her silence regarding these matters—constitutes "a statement that was made" for purposes of the hearsay rule. (*Ibid.*) However, "nonverbal conduct"—such as a person's silence—constitutes a "statement" under the hearsay rule only if it was "intended by [the person] as a substitute for oral or written verbal expression." (*Id.*, § 225.) Indeed, as defendant explains in his brief, regarding this issue, Gladys made "no qualifying statement, spontaneous or otherwise." Because nothing suggests Gladys intended her failure to say anything about

---

[9] Notably, when defense counsel subsequently objected to the court's finding, he did not disagree with the court's observation; he mentioned only that Juror No. 8812's father was only "about 125 miles away" and that it was "really uncertain when the father [would] die." Neither of these facts lessens the court's concern, based in part on its personal observations, that Juror No. 8812 would not "be able to concentrate on this trial" and would not be "a very receptive juror."

the loss or theft of her wallet, checks, or credit cards, to be "a substitute for oral or written verbal expression" (*ibid.*), Bouffard's testimony to that effect was not hearsay.[10] (Cf. *People v. Snow* (1987) 44 Cal.3d 216, 227 [242 Cal.Rptr. 477, 746 P.2d 452] ["nonassertive responses or reactions," such as defendant's lack of reaction upon hearing news of victim's death, are not hearsay].)

We also reject defendant's argument that, by "rul[ing] three times in the jury's presence that what Mrs. Benson did not tell [Bouffard] about her wallet, credit cards and checks was admissible as spontaneous declarations," the trial court "elevated Mrs. Benson's alleged silence . . . to assertive nonconduct . . . which constitutes hearsay." Even were it legally possible to find that a trial court's ruling on a hearsay objection transforms nonhearsay into hearsay—a question we need not decide—the record here would not warrant such a finding. That record does not support defendant's characterization of the trial court's ruling: that Gladys's *silence*—i.e., her *failure* to say anything—constituted a spontaneous declaration. Rather, it reflects a ruling that *if* Gladys *did* say something to her daughter about the matters in question, those statements would constitute spontaneous declarations. Because the jury would not have understood the trial court's ruling as defendant suggests, his argument that the trial court's ruling elevated Gladys's silence into assertive nonverbal conduct fails.[11]

### 4. *Testimony That Evidence Was Sent to Defense Laboratory*

During her testimony about the testing of the items taken from defendant upon his arrest, criminalist Gisele LaVigne stated that although the tests showed the presence of blood on defendant's ring, she did not perform

---

[10] To explain the intent of the statutes governing defendant's hearsay argument (Evid. Code, §§ 225, 1200), the relevant legislative committees submitted a comment to the Legislature explaining: "[E]vidence of a person's conduct out of court is not inadmissible under the hearsay rule expressed in [Evidence Code] [s]ection 1200 unless that conduct is clearly assertive in character. Nonassertive conduct is not hearsay. [¶] . . . [¶] Under the Evidence Code, nonassertive conduct is not regarded as hearsay for two reasons. *First*, one of the principal reasons for the hearsay rule—to exclude declarations where the veracity of the declarant cannot be tested by cross-examination—does not apply because such conduct, being nonassertive, does not involve the veracity of the declarant. *Second*, there is frequently a guarantee of the trustworthiness of the inference to be drawn from such nonassertive conduct because the actor has based his actions on the correctness of his belief, *i.e.*, his actions speak louder than words." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 333 (1965 Reg. Sess.) 1 Assem. J. (1965 Reg. Sess.) p. 1755; see also Sen. Com. on Judiciary, Rep. on Assem. Bill No. 333 (1965 Reg. Sess.) 2 Sen J. (1965 Reg. Sess.) p. 1573 [adopting comment in Assem. Com. on Judiciary Report].)

[11] Although this analysis is different from the trial court's, "we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm." (*People v. Geier* (2007) 41 Cal.4th 555, 582 [61 Cal.Rptr.3d 580, 161 P.3d 104] (*Geier*).)

additional tests to determine whether the blood was from a human or an animal. In explaining why, she stated: "The stain [from the ring] was so small, that I would have consumed it had I attempted to do any additional analysis." The prosecution then asked why LaVigne was "concern[ed] about consuming all of the blood," and she replied: "Well, my initial concern is that I want to get the most information from that stain. But I also want to keep in mind that if this case is going to be analyzed by a defense lab, I need to leave a little bit of the sample for them to be able to reexamine." The prosecution then asked whether "that was done in this case," and LaVigne replied: "The evidence was released to a defense lab."

Defense counsel "object[ed] to [this] answer and ask[ed] that it be stricken," explaining: "The appointment of the defense lab was done confidentially. I think it's improper that the jury be informed that a defense lab was appointed. And I think that definitely prejudices the defense case. The preliminary indication being if I don't put any defense evidence on, the jury will come to the conclusion that the defense lab's analysis does not help the defense case. So, therefore, I would ask for a mistrial at this point." The prosecution responded that (1) "defense lab work is not covered by the attorney/client privilege," (2) "chain of custody" is "something I'm going to have to go into with" LaVigne because defendant "filed a written motion contesting" that issue,[12] and (3) "it's fair comment . . . that counsel did have a split [of the blood samples] done . . . and then didn't put anybody on." The court then stated: "I'm going to decline to grant the mistrial. I don't see any prejudice to the question—or the question itself." Defense counsel then stated his intent to "object every time any mention is made of defense lab or defense testing or lack of clothing because it's in the hands of the defense lab, etc., unless the court will deem that to be a continuing objection." With the prosecution's consent, the court ruled that "any reference by this witness to material going to the defense or defense lab will be deemed objected to by defense counsel."

LaVigne later testified on direct examination that "[t]he clothing items were released to a defense lab, and according to the record, they have not been returned yet." On redirect examination, the prosecution asked: "[Y]our results and the evidence in this case [were] sent to a defense laboratory, is that correct?" Defense counsel objected, "incorporat[ing]" his earlier argument "by reference." After the court overruled the objection, the prosecution asked: "It was all sent to a defense lab?" LaVigne replied: "Yes, it was."

---

[12] It appears that defendant's "chain of custody" motion only raised issues regarding the evidence's treatment "at the crime scene," before it was "delivered to the crime lab." On appeal, the People do not argue the evidence was admissible to establish chain of custody.

Defendant claims the trial court prejudicially erred in permitting LaVigne to testify she sent the tested evidence and her test results to a defense laboratory. In his opening brief, he asserts that admission of this evidence "deprived [him] of his right to effective assistance of counsel, and denied him his rights to a fair trial and to due process under the federal and state Constitutions." He argues that "the defense's access to the blood evidence . . . was a direct exercise of [his] Sixth Amendment right to the effective assistance counsel," and that "[b]y adducing evidence regarding the exercise of that right to bolster the prosecution case, the prosecutor unfairly made the assertion of that right costly." In his reply brief, defendant takes a seemingly different tack, explaining that "the thrust of [his] argument is that the prosecutor's improper questions and LaVigne's answers thereto disclosed confidential information protected by the work product privilege, and left [the] jury with the obvious impression that the reason the defense did not offer any expert testimony . . . was that the defense expert's analysis . . . was the same as the prosecution's."

Initially, this record presents substantial questions regarding defendant's ability to raise these arguments on appeal. As the discussion above demonstrates, at trial, defense counsel did not offer a constitutional basis for his objection. Under these circumstances, a constitutional claim is not cognizable on appeal unless (1) it "is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution." (*Boyer, supra*, 38 Cal.4th at p. 441, fn. 17.) Defendant's constitutional claims do not fall under the former exception. Thus, they are cognizable only to the extent they do not involve facts or legal standards different from those defendant presented to the trial court. In other words, defendant "may not [now] argue on appeal that [constitutional provisions] required exclusion of the evidence for reasons other than those articulated in his . . . argument" at trial. (*People v. Partida* (2005) 37 Cal.4th 428, 435 [35 Cal.Rptr.3d 644, 122 P.3d 765] (*Partida*).)

Defendant's work product argument also faces procedural hurdles. For one, defendant first raised it in his reply brief.[13] "Normally, a contention may not be raised for the first time in a reply brief. [Citation.]" (*People v. Peevy* (1998)

---

[13] A footnote in defendant's recitation of the relevant facts contains the sole mention in defendant's opening brief of the work product privilege. There, after noting the prosecution's statement below that it had "the right" under California law "to subpoena in and call [defendant's] expert," defendant stated: "[T]he prosecutor was clearly mistaken, as he had no such right. [Citations.] [¶] In addition, the confidentiality of the defense expert's findings in the present case was protected by the attorney work-product privilege (Code Civ. Proc., § 2018)."

17 Cal.4th 1184, 1206 [73 Cal.Rptr.2d 865, 953 P.2d 1212]; see also *People v. Bonilla* (2007) 41 Cal.4th 313, 349–350 [60 Cal.Rptr.3d 209, 160 P.3d 84] ["By waiting until his reply brief to argue that the prosecution's use of strikes should be subjected to a comparative juror analysis, [defendant] has forfeited the issue."].)

Perhaps more importantly, it appears that defendant did not adequately invoke the work product privilege in objecting at trial. Under California law, error in admitting evidence may not be the basis for reversing a judgment or setting aside a verdict unless "an objection to or a motion to exclude or to strike the evidence . . . was timely made and *so stated as to make clear the specific ground of the objection or motion . . . .*" (Evid. Code, § 353, subd. (a), italics added.) "In accordance with this statute, we have consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable. [Citations.]" (*People v. Seijas* (2005) 36 Cal.4th 291, 302 [30 Cal.Rptr.3d 493, 114 P.3d 742].) Although no "particular form of objection" is required, the objection must "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*Partida, supra,* 37 Cal.4th at p. 435.)

Defendant's objection did not fairly inform the trial court or the prosecution that defendant was objecting on work product grounds. As set forth above, in objecting to LaVigne's testimony, defense counsel stated only that "[t]he appointment of the defense lab was done confidentially," that it was "improper [for] the jury [to] be informed that a defense lab was appointed," and that this information "prejudice[d] the defense case" by supporting "the conclusion that the defense lab's analysis does not help the defense case." At no point did defense counsel mention the work product privilege or in any way indicate—for example, by citing a relevant statute or decision—that the work product privilege was the basis for his claim of confidentiality. In short, defendant is now impermissibly seeking to "assert[] [on appeal] a different theory for exclusion than he asserted at trial." (*Partida, supra,* 37 Cal.4th at p. 438.)

 In any event, defendant's work product claim fails on its merits. Under Code of Civil Procedure section 2018.030, work product generally enjoys one of two levels of protection in California. Subdivision (a) of that section establishes absolute protection for "[a] writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories"; such

Defendant did not again mention the work product privilege in arguing that the trial court erred in permitting LaVigne to testify she sent the tested items and her findings to a defense laboratory.

writings are "not discoverable under any circumstances." (Code Civ. Proc., § 2018.030, subd. (a).) Subdivision (b) of that section establishes qualified protection for work product "other than a writing described in subdivision (a)"; such material is "not discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice." (Code Civ. Proc., § 2018.030, subd. (b).) In 1990, by passing Proposition 115, the electorate enacted Penal Code section 1054.6, which currently provides in relevant part: "Neither the defendant nor the prosecuting attorney is required to disclose any materials or information which are work product *as defined in subdivision (a) of Section 2018.030 of the Code of Civil Procedure* . . . ." (Italics added.)[14] Through its reference to Code of Civil Procedure section 2018.030, subdivision (a), Penal Code section 1054.6 " 'expressly limits the definition of "work product" *in criminal cases* to "core" work product, that is, any *writing* reflecting "an attorney's impressions, conclusions, opinions, or legal research or theories." ' " (*Garcia v. Superior Court* (2007) 42 Cal.4th 63, 68, fn. 2 [63 Cal.Rptr.3d 948, 163 P.3d 939], italics added.) The evidence in question here—LaVigne's testimony about *the prosecution's actions* in sending the tested items and the test results to a defense laboratory—does not qualify as a "writing that reflects" defense counsel's "impressions, conclusions, opinions, or legal research or theories." (Code Civ. Proc., § 2018.030, subd. (a).) Nor does anything in the record suggest the testimony derived from any such writing. The admission of this evidence therefore did not contravene the work product privilege as it applies in criminal cases.[15] (Cf. *Pope v. State* (Tex.Crim.App. 2006) 207 S.W.3d 352, 354–355 [work product privilege does not preclude prosecution's DNA testing experts from testifying they forwarded their reports to another expert].)

In arguing otherwise, defendant relies on *People v. Coddington* (2000) 23 Cal.4th 529 [97 Cal.Rptr.2d 528, 2 P.3d 1081] (*Coddington*). There, during

---

[14] When defendant committed his crimes and when his trial occurred, Penal Code section 1054.6 referred to Code of Civil Procedure former section 2018, subdivision (c), which then stated the absolute work product protection now stated in Code of Civil Procedure section 2018.030, subdivision (a). (Pen. Code, former § 1054.6, enacted by Prop. 115 (Crime Victims Justice Reform Act) as approved by voters, Primary Elec. (June 5, 1990); see 1 Stats. 1990, pp. A-252, A-254, § 23; Code Civ. Proc., former § 2018, subd. (c), as amended by Stats. 1990, ch. 207, § 1, p. 1364.) Code of Civil Procedure former section 2018, subdivision (c), was later repealed and reenacted in substantively identical form as Code of Civil Procedure section 2018.030, subdivision (a). (Stats. 2004, ch. 182, §§ 22, 23.) At the same time, Penal Code section 1054.6 was amended to refer to Code of Civil Procedure section 2018.030, subdivision (a). (Stats. 2004, ch, 182, § 50.) Our analysis would be the same under the prior statutes.

[15] Our rejection of defendant's work product claim on the merits "necessarily leads to rejection" of his constitutional challenges to LaVigne's testimony insofar as they do not involve facts or legal standards different from those defendant presented at trial, and thus are cognizable on appeal despite his failure at trial to object to the testimony on a constitutional basis. (*Boyer, supra,* 38 Cal.4th at p. 441, fn. 17.)

the sanity phase of the defendant's trial, the prosecution asked the defendant's testifying experts whether they were aware that three nontestifying defense experts also had evaluated the defendant, and emphasized in closing argument that the testifying defense experts had no knowledge of the nontestifying experts. (*Id.* at p. 604.) We found a violation of the work product privilege, reasoning that the prosecutor's questioning and argument "contravened" the policies the privilege reflects. (*Id.* at p. 606.)

■ Defendant's reliance on *Coddington* is misplaced. Although we decided *Coddington* after section 1054.6's enactment, our opinion did not mention that statute, and properly so. Because the trial in *Coddington* ended in 1989 (*Coddington, supra,* 23 Cal.4th at p. 547), before section 1054.6's enactment, the statute was inapplicable in the case and irrelevant to our work product analysis. (See *Tapia v. Superior Court* (1991) 53 Cal.3d 282 [279 Cal.Rptr. 592, 807 P.2d 434].) Thus, as we explained in *Coddington,* the work product privilege there at issue extended beyond the writings now listed in Code of Civil Procedure section 2018.030, subdivision (a), to include "any other aspect of an attorney's work product, unless denial of discovery would unfairly prejudice a party. [Citation.]" (*Coddington, supra,* at p. 605.) Here, by contrast, because defendant's crimes and his trial occurred well after 1990, Penal Code section 1054.6 applies and strictly limits the scope of the work product privilege only to "writing[s] that reflect[] an attorney's impressions, conclusions, opinions, or legal research or theories . . . ." (Code Civ. Proc., § 2018.030, subd. (a).) As explained above, defendant's work product claim fails under this restricted definition.[16]

### 5. *Sufficiency of the Evidence of Robbery*

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) To commit the crime, "the defendant must form the intent to steal before or during rather than after the application of force to the victim, and . . . must apply the force for the purpose of accomplishing the taking. [Citations.]" (*People v. Bolden* (2002) 29 Cal.4th 515, 556 [127 Cal.Rptr.2d 802, 58 P.3d 931] (*Bolden*).)

Defendant contends the evidence is insufficient to support his robbery conviction, his conviction of murder in the course of robbery or attempted robbery, and the special circumstance finding that he committed the murders

[16] Because *Coddington* is distinguishable, we express no opinion regarding its continuing efficacy. (See *People v. Stevens* (2007) 41 Cal.4th 182, 210 [59 Cal.Rptr.3d 196, 158 P.3d 763] [questioning *Coddington*]; *People v. Gray* (2005) 37 Cal.4th 168, 238 [33 Cal.Rptr.3d 451, 118 P.3d 496] (conc. opn. of Baxter, J.) [calling for reexamination of *Coddington*]; *id.* at p. 238 (conc. opn. of Chin, J.) [calling for reconsideration of *Coddington*].)

while engaged in the commission of robbery, and that the jury's verdict on these charges therefore violated his due process rights under the state and federal Constitutions. He concedes the evidence is sufficient to show he "applied force or fear against the victims." But, he asserts, it "is insufficient to show that there was a felonious taking of personal property belonging to either of the victims." He also asserts that, "assuming arguendo" the evidence is sufficient to show "property was taken," it is insufficient to show he "had a larcenous intent either prior to or during the application of force or fear against the victims, or that the force was used for the purpose of perpetuating the robbery." In his view, the "more reasonable" interpretation of the evidence is that he went to the Bensons' home to request another loan, killed Gladys in a fit of "uncontrollable rage" when she rejected his request and "criticized him harshly for having wasted the $100 she had loaned him previously on alcohol," and then killed Elmer when "he came to his wife's defense." He "then left the Benson home either without taking any property, or only took property as 'an afterthought' because at the time the property was taken both of the victims were dead."

To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. (*People v. Maury* (2003) 30 Cal.4th 342, 403 [133 Cal.Rptr.2d 561, 68 P.3d 1] (*Maury*).) The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Id.* at p. 396.) In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. (*Boyer, supra*, 38 Cal.4th at p. 480.) "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" (*Maury, supra*, at p. 403.) A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. (*Maury, supra*, 30 Cal.4th at p. 396.) We "must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" (*Ibid.*) "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the

jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054 [99 Cal.Rptr.2d 1, 5 P.3d 68] (*Kraft*).) Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. (*Ibid.*)

Regarding defendant's taking of the Bensons' property, a reasonable jury could have found that defendant took coins, checks, credit cards, a wallet, and an envelope marked "pink slips" or "DMV." At the outset, it is important to keep in mind one overarching consideration defendant does not dispute: the jury could reasonably have found from the evidence that he had recently borrowed $100 from the Bensons on February 8 because he was not working, that he was supposed to repay the loan by February 22, that he spent all of his money at a bar the night before the murders, that he did not want his wife to know about the loan and did not want to ask her for money, and that he killed the Bensons by stabbing them multiple times only three days after receiving the loan and only hours after spending all of his money at the bar. Defendant ignores this evidence in discussing only evidence relating to the specific items of property in question.

As to the coins, when defendant was arrested on the day of the murders, he had a number of old coins in his pocket from the 1960's and the 1940's, including a 1942 Mercury head dime, a 1947 dime, and a 1944 nickel. During a search of the Bensons' house, police found three old coins—a 1944 dime, a 1963 penny, and a 1968 penny—on Gladys's partially made bed. Micki Downey testified that her parents collected old coins from the 1960's and earlier. Linda Bouffard testified that in the mid-1960's, when she worked in a bank, Elmer started collecting coins—including old dimes, nickels, and pennies—and, "for about a week," gave her $20 every morning and asked her to bring back a roll of quarters and two rolls of dimes. She also testified that after the murders, she and other family members searched the Bensons' house for money, but were unable to find all of the quarters. Based on this evidence, a jury that could reasonably find defendant owed the Bensons money, was not working and had no money, and killed the Bensons, could also reasonably find that defendant took the coins found in his pocket from the Bensons. Moreover, on this record, the jury was not, as defendant argues, required to find otherwise by the testimony of defendant's wife that her family collected coins and that defendant carried old coins in his pocket.

As to the wallet, checks, and credit cards, the Bensons' children testified that Gladys always kept in her purse a burgundy wallet containing a checkbook and credit cards, and that after the murders, they were unable to find any of these items. Linda Bouffard also testified that Gladys never said

anything about any of these items being lost or taken, and that a "whole . . . series of 25 checks were missing." In light of the other facts the jury could reasonably have found—including that defendant killed the Bensons and took coins from them—this testimony is sufficient to support the jury's finding that defendant also took Gladys's wallet, checks, and credit cards. Although, as defendant maintains, the jury could have found otherwise—based on testimony that other valuables were found in the home after the murders and the fact defendant was not found with any of the missing items—because the circumstances reasonably justify the jury's verdict, reversal would be inappropriate. (*Kraft, supra,* 23 Cal.4th at pp. 1053–1054.)

Finally, as to the envelope, the Bensons' children testified the Bensons owned a number of vehicles and kept the "pink slips" for them in an envelope marked "DMV" or "pink slips" in an organizer on a desk, and that they (the children) searched for the envelope after the murders but could not find it or the "pink skips" it contained. After the murders, defendant told police he had given the Bensons the "pink slip" to his car as collateral for the money he borrowed from them on February 8. Defendant's wife testified defendant told her the same thing. Again, in light of the other facts the jury could reasonably have found, as set forth above, this evidence is sufficient to support the jury's finding that defendant took the envelope in question. Contrary to defendant's argument, the testimony of the Bensons' son-in-law that he found among the Bensons' effects an envelope containing the pink slip to defendant's car does not change this conclusion. The jury could reasonably have concluded defendant took the envelope containing the other pink slips because he assumed, based on its markings, it contained his pink slip.

■ In light of the preceding discussion, defendant's argument that the evidence is insufficient to show he had a larcenous intent either before or during the killings necessarily fails. "From evidence that a defendant killed another person and at the time of the killing took substantial property from that person, a jury ordinarily may reasonably infer that the defendant killed the victim to accomplish the taking and thus committed the offense of robbery. [Citations.]" (*Bolden, supra,* 29 Cal.4th at p. 553.) Thus, the evidence that supports the finding defendant took the Bensons' property when he killed them also supports the finding he had the intent required for robbery. Also supporting the latter finding is the evidence defendant recently borrowed money from the Bensons, spent all of his money at a bar only hours before the killings, did not want his wife to know about the loan, and did not want to ask his wife for money. Taken together, this evidence amply supports the jury's finding regarding defendant's intent. Contrary to defendant's argument, that the evidence does not conclusively rule out his proposed alternative scenario—that he killed the Bensons in a fit of uncontrollable rage when Gladys rejected his request for another loan and harshly criticized him

for wasting his money on alcohol—"does not render the evidence insufficient to support the [jury's] verdict." (*Ibid.*)[17]

### 6. *Failure to Instruct on Theft and After-acquired Intent*

At trial, defendant asked the trial court to give several jury instructions consistent with the theory he did not form the intent to steal until after he killed the Bensons. Specifically, he asked for instructions on various theft offenses, which are lesser included offenses of robbery that do not include the element of force or fear. (See *People v. Holt* (1997) 15 Cal.4th 619, 675 [63 Cal.Rptr.2d 782, 937 P.2d 213].) Defendant also asked the court to instruct the jury on after-acquired intent as follows: "To convict the defendant of robbery you must find that he had the specific intent to steal at the time of the application of force or violence, or the use of fear or intimidation. [¶] If after consideration of all the evidence you have a reasonable doubt that defendant had the intent to steal at the time the force or fear was applied, you must find him not guilty of robbery." Defendant proposed an alternative instruction containing only the first of these two sentences.

The trial court refused to give any of the proposed instructions. It agreed with the prosecution that the proposed theft instructions were not "appropriate" in light of the evidence. As to after-acquired intent, the trial court stated its "opinion" that the standard CALJIC instructions on robbery "more thoroughly cover[ed] the issues" than the instructions defendant proposed. Consistent with this ruling, the trial court later gave the standard CALJIC instructions on robbery, CALJIC Nos. 9.40, 9.41, and 9.42. Defendant argues the trial court erred in refusing to give the instruction he requested.

Defendant's argument fails for a basic reason: the absence in the record of evidentiary support for a finding that he formed the intent to steal only after killing the Bensons. Instructions on after-acquired intent and theft as a lesser included offense of robbery are unwarranted absent "substantial evidence" that the defendant first formed the intent to take the victim's property after applying force. (*People v. Valdez* (2004) 32 Cal.4th 73, 112, fn. 13 [8 Cal.Rptr.3d 271, 82 P.3d 296].) As previously explained, there was ample evidence here that defendant killed the Bensons and took their property because he needed or wanted money. To counter this strong evidence of his larcenous intent, defendant cites no evidence at trial that he asked for more money, that Gladys denied such a request and criticized him for spending his money on alcohol, and that he went into an uncontrollable rage. Instead, he

---

[17] Our conclusion that the evidence is sufficient to sustain the jury's verdict necessarily disposes of defendant's closely related claim, based on the same insufficiency-of-the-evidence argument, that the trial court erred in denying his motion for acquittal as to the two robbery counts.

offers only generalities about his character and his relationship with the Bensons, citing evidence that he "was on friendly terms with [them] and often did household chores for them at no charge, and that he was a good person who respected the property rights of others, had a reputation for peacefulness and nonviolence, and had no prior criminal record." But " 'the existence of "*any* evidence, no matter how weak" will not justify instructions on' " theft as a lesser included offense of robbery. (*People v. DePriest* (2007) 42 Cal.4th 1, 50 [63 Cal.Rptr.3d 896, 163 P.3d 896].) Defendant offers nothing but sheer speculation to support his theory that the idea of taking the Bensons' property did not arise until after he killed them. Instead, all of the evidence points to a robbery as the motivating factor for the murders. Under such circumstances, the trial court did not err in refusing to give the requested instructions. (See *People v. Lewis* (1990) 50 Cal.3d 262, 277 [266 Cal.Rptr. 834, 786 P.2d 892].)[18]

Defendant's argument regarding the requested after-acquired intent instruction fails for another reason: it was unnecessary in light of the other instructions the jury received. Along with the standard CALJIC robbery instruction (CALJIC No. 9.40), the trial court also gave the CALJIC felony-murder instruction (CALJIC No. 8.21), the CALJIC instruction regarding the concurrence of act and specific intent (CALJIC No. 3.31), and the CALJIC instruction on the robbery-murder special-circumstance allegation (CALJIC No. 8.81.17). These instructions together "adequately informed" the jury "concerning the point in time the intent to steal must have been formed." (*People v. Hughes* (2002) 27 Cal.4th 287, 360 [116 Cal.Rptr.2d 401, 39 P.3d 432].) "Because defendant's proposed instructions would merely have elaborated on these general instructions, the trial court's refusal to give them was not error. [Citation.]" (*People v. Hayes* (1990) 52 Cal.3d 577, 626 [276 Cal.Rptr. 874, 802 P.2d 376].)[19]

---

[18] As the People argue, the evidence defendant cites hardly supports the theory he offers. It seems extremely unlikely that a truly peaceful person who has no history of violence and is on very friendly terms with his victims would fly into a homicidal rage simply because his victims decline his request for a second loan and criticize his spending choices. Notably, at trial, defendant was of a similar view. During the guilt phase of the trial, just after counsel gave closing argument and the jury retired to deliberate, defendant, through a written statement he had his attorney read into the record, stated that his counsel's after-acquired intent theory was "silly."

[19] In their briefs, defendant and the People both state that the trial court indicated it would give CALJIC No. 9.40.2, which provides: "To constitute the crime of robbery, the perpetrator must have formed the specific intent to permanently deprive an owner of [his] [her] property before or at the time that the act of taking the property occurred. If this intent was not formed until after the property was taken from the person or immediate presence of the victim, the crime of robbery has not been committed." The record, although somewhat ambiguous, does not appear to support this view. The trial court prefaced its statement regarding the thoroughness of the "CALJIC instructions" on "the issues" by referring to "8.83, 8.83.2, 9.40, 9.41 and 9.42." It did not refer to CALJIC No. 9.40.2. The prosecution then asked: "The court is

### 7. Alleged Failure to Charge First Degree Murder

In counts 1 and 2, the information charged that defendant committed "the crime of MURDER, in violation of PENAL CODE SECTION 187(A)" by "murder[ing]" Elmer and Gladys "willfully, unlawfully, and with malice aforethought." Defendant asserts the reference to section 187 and the description of the crime in these counts "establish that [he] was charged exclusively with second degree malice murder in violation of" section 187, "not with first degree murder in violation of" section 189. According to defendant, because the information did not charge first degree murder and did not allege the facts necessary to establish first degree murder, the trial court exceeded its jurisdiction in instructing the jury on first degree murder. Defendant also maintains the error violated his constitutional rights "to due process, a jury determination on every element of the charged crime, adequate notice of the charges against him, and a fair and equitable guilt trial."

■■■ In several cases, we have rejected identical claims. (E.g., *People v. Carey* (2007) 41 Cal.4th 109, 131–132 [59 Cal.Rptr.3d 172, 158 P.3d 743]; *Geier, supra*, 41 Cal.4th at pp. 591–592; *People v. Hughes, supra*, 27 Cal.4th at pp. 368–370.) Given that each murder count charged that defendant committed the murders while "engaged in the commission of the crime of robbery," and that section 189 specifies that such murders are in the first degree, defendant offers no persuasive reason for reaching a different conclusion here.

### 8. Failing to Give Unanimity Instruction on First Degree Murder

The trial court instructed the jury on both premeditated murder and felony murder. Defendant asserts the trial court violated his constitutional rights by failing to instruct the jurors that they had to agree unanimously on which type of murder he committed. We have repeatedly rejected this claim, and

indicating [it] is going to give 9.40.2, the CALJIC instruction?" Although the court replied, "[y]eah," it immediately continued its sentence by clarifying, "the CALJIC instructions, 40, 41 and 42." After defense counsel argued that CALJIC No. 9.40.2 addressed a different factual situation, the prosecutor responded: "I disagree. I believe the CALJIC instruction covers exactly this situation. And it is neutrally phrased." The court responded: "I agree. Once again, I looked at them, reviewed them both, all 3 instructions—5 instructions, rather, very carefully yesterday. So I decline to give it." It appears the court was referring to the five instructions it mentioned at the outset of the discussion, i.e., CALJIC Nos. "8.83, 8.83.2, 9.40, 9.41 and 9.42." The court itself never referred to CALJIC No. 9.40.2, and neither defendant nor the People formally asked the court to give that instruction. This interpretation of the record is consistent with the fact the trial court never gave CALJIC No. 9.40.2. In light of our conclusion, the trial court's failure to give any pinpoint instruction on after-acquired intent was not error.

defendant offers no persuasive basis for reconsidering the question. (See *People v. Carey, supra,* 41 Cal.4th at pp. 132–133.).

### 9. *Superfluous Multiple-murder Special-circumstance Finding*

Defendant correctly asserts that two multiple-murder special-circumstance allegations were erroneously charged and found true. (See *People v. Halvorsen* (2007) 42 Cal.4th 379, 422 [64 Cal.Rptr.3d 721, 165 P.3d 512].) "In numerous cases involving the same kind of error, we have stricken the superfluous finding and concluded the defendant suffered no prejudice. [Citations.] We do so again here. [Citation.]" (*Ibid.*)

### B. *Penalty Phase Issues*

### 1. *Admission of Victim Impact Evidence*

Defendant asked the trial court to review the victim impact evidence the prosecution wanted to present during the penalty phase to determine what, if any, evidence was admissible under Evidence Code section 352. He asked the court to exclude any evidence prohibited under the Eighth and Fourteenth Amendments as unduly inflammatory, including a 14-minute videotaped montage of still photographs narrated by the Bensons' children. He also asked the court to preclude the victim impact witnesses from presenting the Bensons' life histories. The trial court ruled that the picture montage could be played, that the audio portion of the montage—consisting of music and narration—could not be played, and that a family member could describe each photograph in the montage from the witness stand.

The prosecution later played the videotape to the jury during the testimony of Linda Bouffard, who described the photographs. The montage contained 118 photographs, including one of Elmer as a boy, two of Gladys as a girl, and a high school graduation picture of each of them. Most of the remaining photographs showed Elmer, Gladys, or both of them, at various ages during their adult lives, engaging in a variety of activities—raising their three children, serving in the military, hunting, fishing, vacationing, bowling, celebrating holidays and family events, attending recognition dinners for Gladys's community service, working—and often with friends or family members, including their children, parents, siblings, grandchildren, great-grandchildren, nieces, and nephews. The last three photographs in the montage showed, in order, Gladys's grave marker with the inscription legible, Elmer's grave marker with the inscription legible, and both grave markers from a distance, each accompanied by a vase of flowers. The inscription on Gladys's grave marker read: "Mom, you remain in every hearty laugh, nice surprise and reassuring moment of our lives." The inscription on Elmer's

grave marker read: "Dad, you found and shared treasures in life where no one else noticed them." After describing the photographs, Bouffard briefly testified about how she learned of, and was affected by, her parents' murders. The Bensons' other daughter, Micki Downey, and two of their grandchildren also testified about the effects of the murders on themselves and their family. Defendant contends the admission of this evidence, especially the videotape, "violated [his] rights under the Eighth and Fourteenth Amendments to the United States Constitution."

"In a capital trial, evidence showing the direct impact of the defendant's acts on the victims' friends and family is not barred by the Eighth or Fourteenth Amendment[] to the federal Constitution. [Citation.]" (*People v. Pollock* (2004) 32 Cal.4th 1153, 1180 [13 Cal.Rptr.3d 34, 89 P.3d 353] (*Pollock*).) "The federal Constitution bars victim impact evidence only if it is 'so unduly prejudicial' as to render the trial 'fundamentally unfair.' [Citation.] State law is consistent with these principles. Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a)." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056–1057 [47 Cal.Rptr.3d 467, 140 P.3d 775]; see also *Pollock, supra*, at p. 1180 [victim impact evidence is admissible under California law provided it "is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case"].)

Defendant first argues the scope of the evidence admitted exceeded permissible limits under governing precedent, which, he asserts, limits victim impact evidence "to testimony from a single witness" that describes only the murder's effect "on a family member who was present at the crime scene either during or immediately after the crime" if those effects "were known or reasonably apparent to the defendant at the time he committed the crime or were properly introduced at the guilt phase." According to defendant, these limitations are "necessary to make the admission of victim impact evidence consistent with the plain language of California's death penalty statutes, and to avoid expanding the aggravating circumstances to the point that they become unconstitutionally vague."

Defendant's arguments fail under *Pollock*. There, consistent with our prior cases, we held that a trial court may admit "victim impact testimony from multiple witnesses who were not present at the murder scene and who described circumstances and victim characteristics unknown to the defendant. [Citation.]" (*Pollock, supra*, 32 Cal.4th at p. 1183.)[20] We also reaffirmed that

---

[20] Even were the law otherwise, there is little basis for defendant's assertion that he "could [not] possibly have known about" the details of the Bensons' lives and "could not reasonably have anticipated" the impact of their murders on their grandchildren. The evidence establishes

interpreting our death penalty statutes to allow admission of this " 'broad array of victim impact evidence' " does not render those statutes " 'unconstitutionally vague.' [Citation.]" (*Ibid.*)

Defendant also argues the trial court erred in admitting extensive evidence of the Bensons' "complete life histories, from early childhood to death." He asserts this evidence, which was presented through the picture montage narrated in court by Linda Bouffard, was mostly "irrelevant," exceeded permissible limits on victim impact testimony, and "was clearly prejudicial."

In *People v. Kelly* (2007) 42 Cal.4th 763 [68 Cal.Rptr.3d 531, 171 P.3d 548] (*Kelly*), we recently considered and rejected nearly identical arguments based on similar facts. There, during the penalty phase of a capital trial, the prosecution played an approximately 20-minute videotape that "consist[ed] of a montage of still photographs and video clips of [the murder victim's] life, from her infancy until shortly before she was killed at the age of 19, narrated calmly and unemotionally by her mother." (*Id.* at p. 796.) "[G]enerally soft" music "play[ed] in the background" for "much of the video." (*Ibid.*) The videotape "concern[ed] [the victim's] life, not her death. It show[ed] scenes of her swimming, horseback riding, at school and social functions, and spending time with her family and friends." (*Id.* at pp. 796–797.) It "end[ed] with a brief view of [the victim's] unassuming grave marker followed by a video clip of people riding horseback in Alberta, Canada, over which the mother sa[id] this was where [the victim] came from and was the 'kind of heaven' in which she belonged." (*Id.* at p. 797.)

In holding that the videotape permissibly "reviewed all of" the victim's life, we stressed in *Kelly* that (1) "the trial court watched the videotape and exercised its discretion," (2) "[t]he videotape supplemented, but did not duplicate, the mother's testimony," and (3) "[f]or the most part, the videotape, including the mother's narrative, was not unduly emotional and presented material that was relevant to the penalty determination." (*Kelly, supra*, 42 Cal.4th at p. 797.) Regarding relevance, we explained that the videotape "humanized [the victim], as victim impact evidence is designed to do. It contained a factual chronology of [her] life, from her infancy to her death in early adulthood, which helped the jury to understand 'the loss to the victim's family and to society which ha[d] resulted from the defendant's homicide.' [Citation.]" (*Ibid.*) Among other things, it "helped the jury to see that defendant took away the victim's ability to enjoy her favorite activities" and "further illustrated the gravity of the loss by showing [the victim's] fresh-faced appearance before she died. . . . The viewer knew [the victim] better

that between 1990, when defendant first became the Bensons' neighbor, and 1996, when the murders occurred, defendant and his family were on very friendly terms with the Bensons, and defendant often did work for them and was in their home.

after viewing the videotape than before, but the tape expressed no outrage over her death, just implied sadness. It contained no clarion call for vengeance." (*Ibid.*) After noting our previous "caution[] against a presentation that 'emphasizes the childhood of an adult victim,' " we explained: "[T]he videotape did not emphasize any particular period of [the victim's] life but reviewed all of it. Doing so was relevant and, because the presentation was not unduly emotional, permissible." (*Ibid.*)

We also observed, however, that "[i]n some respects, the videotape" in *Kelly* "might have contained irrelevant aspects." (*Kelly, supra*, 42 Cal.4th at p. 798.) In this regard, we first noted that evidence offered in aggravation "must be relevant to the penalty determination," and explained: "Nonfactual dramatization of the evidence in a videotape—in the sense of making a presentation in a dramatic manner—adds irrelevant factors to the videotape. The videotape must factually and realistically portray the victim's life and character and not present a 'staged and contrived presentation . . . .' [Citation.] Trial courts must not permit irrelevant background music or video techniques that enhance the emotion of the factual presentation. Moreover, the videotape, even when presented factually, must not be unduly emotional. [Citation.]" (*Ibid.*) We then commented that the videotape's "background music . . . may have added an irrelevant factor . . . ," because "[i]t had no connection to [the victim] other than that her mother said it was some of [the victim's] favorite music," it "seem[ed] unrelated to the images it accompanied and may have only added an emotional element." (*Ibid.*) We also commented that the "clip" at the end of the videotape showing "people riding horseback" accompanied by the mother saying "this was the 'kind of heaven' in which [the victim] belonged, was also theatric without imparting any additional relevant material." (*Ibid.*) Ultimately, we did not decide whether the trial court abused its discretion in failing to exclude these possibly irrelevant portions, finding that "any error" in "permitting the jury to view and hear" them "along with the rest of the mostly factual and relevant videotape was harmless in light of the trial as a whole." (*Id.* at p. 799.)

Defendant's challenge in this case to the evidence of the Bensons' life histories fails under *Kelly*. To begin with, the 14-minute videotape here was shorter than the 20-minute videotape in *Kelly*. More importantly, like the trial court in *Kelly*, the trial court here viewed the videotape and exercised its discretion. Most notably, consistent with *Kelly*, the court did not let the jury hear "irrelevant background music" (*Kelly, supra*, 42 Cal.4th at p. 798); it excluded the videotape's audio portion—including music—finding it to be unduly prejudicial and inappropriate. The court also directed that the witness narrating the videotape on the stand "be very objective as to what the scene shows" and to refrain from making "inappropriate" comments that might

arouse emotions.[21] Linda Bouffard's in-court testimony describing the pictures on the videotape was consistent with the trial court's direction. Notably, defense counsel did not object during that testimony and defendant's briefs on appeal do not allege a single instance in which Bouffard did not follow the trial court's instruction. In other words, the videotape, along with Bouffard's narration, "was not unduly emotional and presented material that was relevant to the penalty determination." (*Id.* at p. 797.) It did not duplicate the testimony of the other victim impact witnesses. It "humanized [the Bensons], as victim impact evidence is designed to do. It contained a factual chronology of [their lives], . . . which helped the jury to understand 'the loss to [their] family and to society which ha[d] resulted from the defendant's homicide[s].' [Citation.]" (*Ibid.*) The jury "knew [the Bensons] better after viewing the videotape than before, but the tape expressed no outrage over [their] death[s], just implied sadness. It contained no clarion call for vengeance." (*Ibid.*) Although the videotape included a few photographs of the Bensons as young children or teenagers, it "did not emphasize any particular period of [their lives] but reviewed all of [them]. Doing so was relevant and, because the presentation was not unduly emotional, permissible." (*Ibid.*)[22]

Although the trial court did not err in admitting the videotape here, it bears repeating that "[c]ourts must exercise great caution in permitting the prosecution to present victim-impact evidence in the form of a lengthy videotaped or filmed tribute to the victim. . . . [They] must strictly analyze evidence of this type and, if such evidence is admitted, [they] must monitor the jurors' reactions to ensure that the proceedings do not become injected with a legally impermissible level of emotion." (*People v. Prince* (2007) 40 Cal.4th 1179, 1289 [57 Cal.Rptr.3d 543, 156 P.3d 1015].)

Defendant's remaining objections fare no better. Defendant asserts the three photographs at the end of the montage showing the Bensons' grave markers were particularly prejudicial and should have been excluded. This assertion fails under both *Kelly*, in which the videotape ended with a brief view of the victim's grave marker (*Kelly, supra,* 42 Cal.4th at p. 797), and *People v. Harris* (2005) 37 Cal.4th 310, 352 [33 Cal.Rptr.3d 509, 118 P.3d

---

[21] To explain its ruling, the court stated: "There was a scene [on the videotape] with a baby. And there were some comments made by the person narrating, 'the baby's happiness was being in the presence of the grandfather,' I think it was. Those things are inappropriate. I just want a very objective comment about what each scene depicts."

[22] Among the circumstances we discussed in *Kelly* in upholding the videotape's admission there was the fact that "[o]nly the victim's mother testified about the impact of [the] murder" and there was not "repetitive victim impact testimony" from "one witness after another." (*Kelly, supra,* 42 Cal.4th at p. 797.) Here, as noted, there were three victim impact witnesses in addition to Linda Bouffard, for a total of four. However, the testimony of these three additional witnesses was relatively brief and, in view of the entire record, does not establish that the victim impact evidence here either rendered defendant's trial fundamentally unfair or invited a purely irrational response from the jury.

545], which held that a photograph of the victim's gravesite, as "further evidence relating to her death and the effect upon her family . . . was properly admitted as a circumstance of the murders." Defendant also asserts the trial court improperly allowed the Bensons' grandchildren to testify as to their "personal difficulties following" the Bensons' murder. However, "evidence that close friends and relatives of the victims suffered emotional trauma as a result of their deaths [is] permissible victim impact testimony . . . ." (*Leonard, supra,* 40 Cal.4th at p. 1419 [testimony of victim's cousin permissible].)

### 2. Alleged Failure to Instruct on Use of Victim Impact Evidence

Defendant asserts the trial court prejudicially erred in failing to give an instruction that would have explained the proper use of victim impact evidence and admonished the jury not to base its decision on emotion or improper facts. At trial, he proposed the following special instruction: "Evidence has been introduced for the purpose of showing the specific harm caused by the defendant's crime. Such evidence, if believed, was not received and may not be considered by you to divert your attention from your proper role of deciding whether defendant should live or die. You must face this obligation soberly and rationally, and you may not impose the ultimate sanction as a result of an irrational, purely subjective response to emotional evidence and argument. On the other hand, evidence and argument on emotional though relevant subjects may provide legitimate reasons to sway the jury to show mercy." The trial court declined to give this instruction.

 For several reasons, the trial court did not err in declining to give defendant's proposed instruction. First, the substance of the requested instruction, insofar as it correctly stated the law, was adequately covered by the slightly modified version of CALJIC 8.84.1 the trial court gave; "[t]he proposed instruction would not have provided the jury with any information it had not otherwise learned from CALJIC No. 8.84.1 . . . ." (*People v. Ochoa* (2001) 26 Cal.4th 398, 455 [110 Cal.Rptr.2d 324, 28 P.3d 78] [affirming refusal to give virtually identical proposed instruction].)[23] Second, the requested instruction is misleading to the extent it indicates that emotions may play no part in a juror's decision to opt for the death penalty. Although jurors must never be influenced by passion or prejudice, at the penalty phase, they "may properly consider in aggravation, as a circumstance of the crime, the impact of a capital defendant's crimes on the victim's family, and in so doing [they] *may exercise sympathy for the defendant's murder victims and . . . their bereaved family members.* [Citation.]" (*Pollock, supra,* 32 Cal.4th at

---

[23] In relevant part, the trial court orally instructed: "You must neither be influenced by bias or prejudice against the defendant, nor swayed by public opinion or public feelings. Both the People and the defendant have the right to expect that you will consider all of the evidence, follow the law, exercise your discretion conscientiously, and reach a just verdict."

p. 1195, italics added.) "Because the proposed instruction was misleading . . . , and because the point was adequately covered by the instructions that the court did give, the trial court acted correctly in refusing to use" the instruction defendant proposed. (*People v. Bolden, supra,* 29 Cal.4th at p. 556.)

On appeal, defendant contends the trial court should have, on its own motion, given a different instruction, which advised: "Victim impact evidence is simply another method of informing you about the nature and circumstances of the crime in question. You may consider this evidence in determining an appropriate punishment. However, the law does not deem the life of one victim more valuable than another; rather, victim impact evidence shows that the victim, like the defendant, is a unique individual. Your consideration must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence. Finally, a victim impact witness is precluded from expressing an opinion on capital punishment and, therefore, jurors must draw no inference whatsoever by a witness's silence in that regard."

■ The earlier discussion of the instruction defendant proposed at trial fully applies to the third sentence of the instruction he now offers on appeal, which would have advised the jury that its consideration of victim impact evidence "must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence." Insofar as this proposed instruction is legally correct, it would not have provided the jurors with any information they did not otherwise learn from CALJIC No. 8.84.1. Moreover, because jurors may, in considering the impact of a defendant's crimes, "exercise sympathy for the defendant's murder victims and . . . their bereaved family members" (*Pollock, supra,* 32 Cal.4th at p. 1195), the proposed instruction is incorrect in suggesting that a juror's "emotional response" to the evidence may play no part in the decision to vote for the death penalty.

The first two sentences of the proposed instruction were adequately covered by another instruction the trial court gave, CALJIC No. 8.85. In this regard, the trial court instructed the jury to "consider, take into account, and be guided by," among other factors, "the circumstances of the crime of which the defendant was convicted in the present proceeding." We have held that this instruction adequately "instruct[s] the jury how to consider" victim impact evidence. (*People v. Brown* (2003) 31 Cal.4th 518, 573 [3 Cal.Rptr.3d 145, 73 P.3d 1137] (*Brown*).)

 The remainder of the proposed instruction, even if we assume it to be legally correct,[24] is not the type to give rise to a sua sponte duty to instruct. A trial court must instruct sua sponte "only on those general principles of law that are closely and openly connected with the facts before the court and *necessary for the jury's understanding of the case.* [Citation.]" (*People v. Price* (1991) 1 Cal.4th 324, 442 [3 Cal.Rptr.2d 106, 821 P.2d 610], italics added.) Instructions informing the jurors that the law does not deem the life of one victim more valuable than another, and cautioning them not to draw an adverse inference from a victim impact witness's silence regarding capital punishment, were not necessary to the jury's understanding of this case. Therefore, the trial court had no sua sponte duty to give such instructions. (Cf. *People v. Navarette* (2003) 30 Cal.4th 458, 521 [133 Cal.Rptr.2d 89, 66 P.3d 1182] [no sua sponte duty to instruct jurors not to draw adverse inference from defendant's failure to testify]; *People v. Sully* (1991) 53 Cal.3d 1195, 1241 [283 Cal.Rptr. 144, 812 P.2d 163] [no sua sponte duty to instruct jurors to disregard defendant's absence, because no "inevitable prospect of prejudice" exists "when a defendant voluntarily absents himself and the jury is so informed"]; *People v. Hovey* (1988) 44 Cal.3d 543, 566 [244 Cal.Rptr. 121, 749 P.2d 776] [no sua sponte duty to give "cautionary instructions regarding [a jailhouse] informant's testimony"]; *People v. Gardner* (1969) 71 Cal.2d 843, 854 [79 Cal.Rptr. 743, 457 P.2d 575] [no sua sponte duty to instruct jurors not to draw adverse inference from defendant's failure to testify, because instruction is "not necessary for the jury's understanding of the case"].)

### 3. *Refusing Defendant's Lingering Doubt Instruction*

 Defendant argues the trial court prejudicially erred and violated his state and federal constitutional rights in denying his request for a lingering doubt instruction. We have repeatedly held that a lingering doubt instruction "is required neither by state nor federal law [citation], and . . . that this concept is sufficiently covered in CALJIC No. 8.85. [Citations.]" (*Geier, supra,* 41 Cal.4th at p. 615.) Defendant offers no basis for reexamining the issue.

---

[24] See *Pollock, supra,* 32 Cal.4th at page 1180 (testimony from victims' family members or friends regarding appropriate punishment is not permitted); *Com. v. Means* (2001) 565 Pa. 309 [773 A.2d 143, 158–159] (recommending, but not requiring, instruction stating that "the law does not deem the life of one victim more valuable than another; rather, victim impact evidence shows that the victim, like the defendant, is a unique individual"); but see *State v. Copeland* (Mo. 1996) 928 S.W.2d 828, 843 (prosecution's argument during penalty phase that "the jury must determine whose lives are more valuable . . ." was permissible).

#### 4. *Refusing Defendant's Instruction on the Death Penalty's Deterrent Effect and Costs of Punishments*

 Defendant argues the trial court prejudicially erred and violated his state and federal constitutional rights in refusing to give a proposed instruction directing the jury "not [to] consider for any reason the deterrent or nondeterrent effect of the death penalty or the monetary cost to the state of execution or maintaining a prisoner for life without the possibility of parole." However, as we have held, a trial court does not err in refusing to give such an instruction where "neither party raise[s] the issue of either the cost or the deterrent effect of the death penalty . . . ." (*Brown, supra*, 31 Cal.4th at p. 566.)

On appeal, defendant concedes that "neither party mentioned the issue of deterrence" at trial. He contends, however, that the prosecution raised the issue of cost "by implication" by arguing that were defendant sentenced to life without the possibility of parole, he would enjoy "[t]hree meals a day provided to him, books and libraries, television and movies, gymnasiums to work out in, conjugal visits with his wife." From this statement, defendant asserts, "it must have been obvious to the jury that the taxpayers would pay for [his] meals, movies, books, etc., if he [were] sentenced to prison for life." Defendant also contends his own counsel "raised the subject of cost . . . by implication, by pointing out that if [defendant were] sentenced to prison for life . . . , he would be spending the next 40 years or so in prison."

Defendant's arguments are unconvincing. As the People explain, the prosecution's statement was made in the context of explaining why life in prison would not be a just punishment for defendant's crimes. After rhetorically asking whether those crimes "call[ed] for life without possibility of parole," the prosecutor continued: "You think about life without possibility of parole, and you think about what he left the Bensons. Life without possibility of parole. Number one, he's alive. Three meals a day provided to him, books and libraries, television and movies, gymnasiums to work out in, conjugal visits with his wife. That is the same thing? That is justice? That is justice in a case like this? That is not justice, folks. That is not justice." Viewed in its proper context, the statement defendant cites does not raise the issue of cost, even by implication. The same is true of defense counsel's statement; as the People argue, defense counsel was not raising the issue of cost, but was merely trying to emphasize the severity of the punishment of a life sentence. Contrary to defendant's argument, merely noting that a life sentence would mean "40 years or so in prison" does not even impliedly raise the issue of cost. (Cf. *Brown, supra*, 31 Cal.4th at p. 566 [cost instruction not required by prosecutor's argument that " '[w]e can't put [defendant] in the prison system until he passes away at 65 or 55 and give him 30, 40 years of an opportunity to kill a guard or kill a doctor or kill someone else' "].)

### 5. Instructing on Inapplicable Sentencing Factors

 Defendant argues the trial court violated his state and federal constitutional rights by giving CALJIC No. 8.85 in its entirety and thereby instructing the jury on aggravating and mitigating factors that were inapplicable on the evidence in the case. In prior decisions, we have consistently rejected the identical claim (e.g., *People v. Wilson* (2005) 36 Cal.4th 309, 360 [30 Cal.Rptr.3d 513, 114 P.3d 758]), and defendant offers no persuasive reason for reconsidering the issue.

### 6. Failing to Instruct on the Meaning of Life Without the Possibility of Parole

 Defendant asserts the term "life without possibility of parole" is a "technical term" that juries "commonly" misunderstand, and that the trial court prejudicially erred and violated his constitutional rights by failing, sua sponte, to instruct the jury that he "would never be considered for parole" were he to receive life without possibility of parole. Defendant's assertion fails under our case law, which establishes that the term " ' "life without the possibility of parole" ' is clear and unambiguous and does not require 'a sua sponte definitional instruction.' [Citation.]" (*People v. Prieto* (2003) 30 Cal.4th 226, 270 [133 Cal.Rptr.2d 18, 66 P.3d 1123].) Again, defendant offers no persuasive basis for reconsidering the issue.

### 7. Instructions on Weighing Aggravating and Mitigating Evidence

 The trial court gave the jury a modified version of CALJIC No. 8.88, the penalty phase instruction that addresses the weighing of aggravating and mitigating evidence. Defendant makes a number of constitutional challenges to the instruction, all of which we have previously rejected. Defendant offers several arguments regarding the instruction's last sentence, which states: "To return a judgment of death each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." Contrary to defendant's arguments, the phrase "so substantial" is not impermissibly vague, and the sentence is not incorrect in stating that the key question is whether the death penalty is warranted, rather than "appropriate." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 124 [17 Cal.Rptr.3d 710, 96 P.3d 30].) As for defendant's remaining arguments, the instruction as a whole was not erroneous in failing to state that (1) the jury must return a life verdict if it finds that the factors in aggravation do not outweigh those in mitigation, (2) neither party bore the burden to persuade the jury of the appropriateness or inappropriateness of the death penalty, and (3) the jury

could return a life sentence even if the circumstances in aggravation outweighed those in mitigation. (*Ibid.*) Defendant offers no persuasive reason for reconsidering any of these issues.

### 8. *The Constitutionality of California's Death Penalty Law*

Defendant makes a number of constitutional challenges to California's death penalty scheme, all of which we have previously rejected. Contrary to defendant's arguments, the statutory scheme "adequately narrows the class of murder for which the death penalty may be imposed [citation], and is not overbroad . . . because of the sheer number and scope of special circumstances [that] define a capital murder . . . ." (*People v. Harris, supra,* 37 Cal.4th at p. 365.) "Consideration of the circumstances of the crime under section 190.3, factor (a), does not result in arbitrary or capricious imposition of the death penalty." (*Ibid.*) The statutory scheme is not invalid in failing to require the state to prove beyond a reasonable doubt that aggravating circumstances exist (other than prior criminality), that aggravating circumstances outweigh mitigating circumstances, or that death is the appropriate sentence, or in failing to impose, or require the jury to be instructed on, any burden of proof regarding penalty. (*Ibid.*) The trial court need not instruct that there is a presumption favoring life imprisonment. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1178 [113 Cal.Rptr.2d 827, 34 P.3d 937].) Nor is the jury constitutionally required to achieve unanimity or make written findings as to aggravating factors. (*Harris, supra,* 37 Cal.4th at p. 366.) "The failure to require intercase proportionality review does not render the law unconstitutional. [Citations.]" (*Ibid.*) Use of the adjectives "extreme" and "substantial" in the list of potential mitigating factors does not act as a barrier to consideration of mitigating evidence. (*People v. Stevens* (2007) 41 Cal.4th 182, 213 [59 Cal.Rptr.3d 196, 158 P.3d 763].) "The trial court is not required to delineate which factors are mitigating or aggravating. [Citation.]" (*Id.* at p. 212.) The death penalty law does not violate a capital defendant's constitutional right to equal protection "because the sentencing procedures for capital defendants are different from those for noncapital defendants. [Citation.]" (*Leonard, supra,* 40 Cal.4th at p. 1430.) Finally, "California's use of the death penalty, which defendant alleges to be a 'regular form of punishment,' does not violate the Eighth and Fourteenth Amendments to the federal Constitution by violating what defendant describes as 'international norms of humanity and decency,' nor does it violate principles of international law. [Citation.]" (*Ibid.*) Defendant offers no persuasive reason for reconsidering any of these issues.

### C. *Cumulative Error*

Defendant argues the cumulative effect of the guilt and penalty phase errors requires reversal of his convictions and death sentence even if none of

the errors is prejudicial individually. As explained above, the only error here was in charging two multiple-murder special-circumstance allegations, and that error was not prejudicial. Defendant's cumulative error claim therefore fails.

### III. CONCLUSION

For the foregoing reasons, we vacate one multiple-murder special-circumstance finding, but otherwise affirm the guilt and penalty judgments of defendant Samuel Zamudio in their entirety.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied June 11, 2008, and the opinion was modified to read as printed above.