Filed 4/10/13  P. v. Downing CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PAUL DOWNING,<br><br>    Defendant and Appellant. | B120629<br><br>(Los Angeles County<br>Super. Ct. No. PA024412) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Ronald S. Coen, Judge.  Affirmed.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Keith H. Borjon and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

_____

After court trial, appellant Paul Downing was convicted of a violation of Penal Code section 422,[1] making terrorist threats. The court also found that appellant had had four prior serious or violent felony convictions within the meaning of sections 667, subdivisions (b) through (i), and 1170.12, subdivisions (a) through (d) (the "Three Strikes" law). He was sentenced to state prison for a term of 25 years to life pursuant to the Three Strikes law, plus one year for a prior prison term pursuant to section 667.5, subdivision (b). On this appeal, he contends that there was insufficient evidence for his conviction and that the court abused its discretion when it refused to strike one or more of his prior convictions. Finding no error, we affirm.

Facts

The relevant events took place on August 4, 1996.[2]

Nineteen-year-old Jeannette Castellanos had a cat named Princess. Jeannette wanted to lend the cat to her sister, who was visiting, so that her sister's daughters could play with it. Jeannette put Princess in a cardboard box and put the box in her sister's truck. As Jeannette's sister started to drive away, Princess got out of the box and jumped onto one of the children. Both the child and the cat cried.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The case was called for trial in April of 1997, but the court declared a doubt about appellant's mental competency. The case was again called in July of 1997, at which point the court found that appellant had regained his competence. Trial took place in September of 1997. Notice of appeal was timely filed, but the appeal was not prosecuted and was dismissed. Remittitur was issued in December 1998. Appellant spent the next several years in Atascadero State Hospital for mental health treatment, then was returned to the general prison population with continued treatment. He then sought to recall the remittitur, and to that end, in June 2011, filed a petition for habeas corpus in the California Supreme Court, asserting ineffective assistance of counsel. In May 2012, that court issued an order to show cause why the relief prayed for in the petition should not be granted. In September 2012, we granted appellant's petition for habeas corpus, recalled the remittitur, and reinstated the appeal.

Jeannette's sister stopped her truck in a neighbor's driveway, detached Princess from her daughter's hair, and put Princess back into the box, this time tying it shut with string. Jeannette and her sister put the box on the bed of the truck.

At this point, appellant, who was the Castellanos's next-door neighbor, came out of his house. His mother was with him. (Jeannette's sister was not parked in appellant's driveway, but that of another neighbor.) Neither of the Downings had ever met any of the Castellanos, although they had been neighbors for several years.

Appellant asked Jeannette what was in the box. On hearing that it was a cat, he asked for a description. On hearing that the cat was gray and white, like appellant's cat Tommy, appellant asked to see the cat.

Jeannette testified that when she gave appellant permission to see the cat he jumped onto the truck bed and ripped into the box, "like mad, like angry." He took out the cat and gave it to his mother, claiming that it was his cat. During these activities, he was screaming loudly, repeatedly calling Jeannette an animal abuser, a "beaner," and a "fucking bitch." He repeatedly said that he would "fuck [her] through the ass," would kill her whole family, and would burn her house down with her family in it. He was right in front of her face. He moved as though he would push her, but did not, because Jeanette moved away.

Jeannette was scared. She thought appellant was going to hit her.

Jeannette ran into the house to call the police. About 10 minutes later, she went back outside. Her father, brother, and sister were outside, too. Appellant had a baseball bat.[3] He was pounding it into his hand "like threatening that he was going to hit us," and said, "Get away from my property or else I'm going to swing at you."

The whole incident took about 45 minutes. It was another hour before the police arrived. Appellant spent that hour outside, with the bat in his hand. Jeannette was in fear

___

[3] The information alleged that appellant personally used the bat, a deadly and dangerous weapon, in the commission of the offense, but the court on its own motion found insufficient evidence for the allegation, and dismissed it.

3

during that period. She also testified that she never got Princess back, because she didn't want to talk to appellant or his mother.

Jeannette's brother testified that when he went outside, appellant was holding the cat. He heard appellant call him and Jeannette "fucking pigs," and "wetbacks," and told them not to be surprised if their house burned down the next day, suggesting a time of three in the morning. Appellant then went into his house and came back with a baseball bat, which he was waving around. He said that he would beat the Castellanos family with the bat.

Jeannette's father testified similarly. Appellant swore, pounded the bat into his other hand, and repeatedly threatened to burn the Castellanos's house down. When appellant swore at him, appellant was inches from his face. Appellant seemed angry and out of control.

The Castellanos witnesses testified that none of them ever threatened appellant.

Appellant and his mother testified that they spent the afternoon running errands, and when they came home, Tommy was not waiting for them on the porch, as he usually was. They started to look for him, and when they heard a cat and a child crying, they went out to investigate.

A young man opened the box at appellant's request. The cat in the box was Tommy. They were not angry, but merely took their cat back. The neighbors were yelling and screaming, but appellant did not swear at Jeannette or members of her family or threaten to burn their house down. Appellant did call them animal abusers, but that was because there was a rope around the cat's neck.

After getting the cat, appellant and his mother went inside their house, and came out again only to look for keys appellant's mother had dropped.

Appellant did own a baseball bat, but he had not touched it in years, and did not take it outside on the day of his arrest. It was in his closet, which is where police found it.

4

Appellant and his mother testified that he had never burned any neighbor's house down, though the FBI had once forced him to plead guilty to charges of arson, involving a former neighbor, the Ruizes.

The court specifically found that the testimony of Jeannette, her father, and her brother was credible, and found appellant guilty of the offense charged.

The court then took additional evidence concerning the prior convictions and found that appellant had suffered the prior convictions alleged.

Appellant asked the court to strike one or more of the prior convictions. The court denied the motion, noting that two of appellant's prior convictions were recent, that one was in 1991, and that appellant was paroled in that case in 1995 and was on parole at the time of this offense.

Discussion

1. Sufficiency of the evidence for the conviction

Among the elements which the prosecution must establish in order to prove a violation of section 422 are that the defendant willfully threatened to commit a crime which would result in death or great bodily injury to another person, that the defendant made the threat with the specific intent that the statement be taken as a threat, and that the threatened person's fear was reasonable under the circumstances. (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228.)

Appellant argues that the evidence did not support a rational inference that his "angry outburst" amounted to or was intended to be a criminal threat, or that it would cause a reasonable person to be sustained with fear for his or her safety.

When considering challenges to the sufficiency of the evidence, we review the whole record to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the finder of fact could reasonably have deduced from the evidence. We do

5

not resolve either credibility issues or evidentiary conflicts, but look for substantial evidence. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Appellant's argument emphasizes the fact that he did not use force, initiate physical contact, go onto the Castellanos's property, or, for instance, come outside with a gas can and matches. It is true that he did not use force, although there was evidence that he got very close to both Jeannette and her father while swearing at them and threatening them, and that he sought to push Jeannette, and would have if she had not moved away. At any rate, force is not an element of the offense, and neither is an immediate ability to carry out the threat. (*People v. Lopez* (1999) 74 Cal.App.4th 675, 679.)

We find substantial evidence that the threats were "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," and that appellant had "the specific intent that the statement . . . [was] to be taken as a threat." (§ 422, subd. (a).)

First, appellant's threats were clearly unequivocal and unconditional. He said that he would rape Jeannette, and would burn her house down, killing her family. To her brother, appellant even specified a time for the arson he threatened.

After learning that the box held a gray and white cat, appellant erupted into curses, racial slurs, and threatening gestures. He jumped onto the truck and tore into the box, seeming angry and out of control. He would have pushed Jeannette -- a teenager -- if she had not moved away. His manner was so intimidating that Jeannette ran into the house to call the police. After that, appellant was not satisfied to have obtained the cat and driven Jeannette away, but screamed and swore at Jeannette's brother and an adult, her father, and repeated his threats to them. Through those acts, he convened a gravity of purpose and an immediate prospect of execution.

As to the "objectively reasonable" element, appellant argues that he had no weapons when he made the threat, and concludes that he had no apparent ability to carry out the threat. We again find substantial evidence. Appellant resorted to rage,

threatening gestures, racial slurs, and threats of rape and arson over a small neighborhood problem. Fear of someone who would react in such a way is objectively reasonable.

2. The ruling on the motion to strike

Appellant argues that the record does not reflect that the trial court engaged in reasoned consideration of all relevant factors, and that nothing in either appellant's personal background or this offense suggests that he was the type of unredeemable violent offender deserving of this sentence, and further argues that the court should have considered his mental illness.

We note first, that while it is true that the court did not specifically mention any factor other than appellant's criminal history, we do not on that account decide that the court did not consider other factors. In particular, appellant's mental illness would have been well known to the court, since the court at one time declared a doubt as to appellant's competency to stand trial.

We review the trial court's decision not to dismiss a prior strike allegation under section 1385 for abuse of discretion (*People v. Carmony* (2004) 33 Cal.4th 367, 376) and see none. "[T]he three strikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so. In doing so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*Id*. at p. 378.)

When this offense occurred, appellant was on parole after being convicted for four counts of arson of an inhabited structure, and after serving prison time for those offenses. Evidence at this trial establishes that the victims of that crime were appellant's Hispanic neighbors. Yet, while on parole, appellant threatened arson and rape against neighbors, and indicated his belief that they were Hispanic by using racial slurs. As respondent argues, appellant's history and the facts of this offense constitute evidence that he was a dangerous person, properly subject to the Three Strikes law.

7

Disposition

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ARMSTRONG, Acting P. J.


We concur:


MOSK, J.


KRIEGLER, J.