Filed 1/15/14  P. v. Canister CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ELIJAH CANISTER,<br><br>        Defendant and Appellant. | B242130<br><br>(Los Angeles County<br>Super. Ct. No. BA390140) |

        APPEAL from a judgment of the Superior Court of Los Angeles County. Clifford L. Klein, Judge.  Affirmed.

        William Hassler, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Elijah Canister appeals from his conviction of battery and assault with a deadly weapon, following a jury trial at which he represented himself.[1] His sole contention on appeal is that the trial court prejudicially erred in allowing the prosecution to reopen its case-in-chief without a showing of good cause. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *The People's Case*

Viewed in accordance with the usual rules on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358), the evidence established that in July 2011, Sherine Brown lived in a one bedroom apartment with her daughter, Waynesha Brown, and Waynesha's children.[2] Sherine used the living room as her bedroom and Waynesha slept in the bedroom. Defendant, the father of Waynesha's children, occasionally stayed overnight at the apartment. At the time, Sherine was dating both Anthony Braux and victim Allen Fox. Fox testified that Braux did not object to Fox's relationship with Sherine, but there was other evidence of friction between the two men. There was also evidence of friction between Fox on the one hand, and Sherine and defendant on the other hand, relating to Fox flirting with Waynesha. Fox testified that he spent the night of July 21 at Sherine's

---

[1]     Defendant was charged by amended information with mayhem, criminal threats and assault with a deadly weapon; in addition to two prior prison term enhancements, a personal infliction of great bodily injury enhancement was alleged on the assault charge. The trial court denied the prosecution's motion to add an aggravated mayhem charge. A jury found defendant not guilty of mayhem, but guilty of the lesser included offense of battery causing serious injury; not guilty of criminal threats; and guilty of assault with a deadly weapon; it found true the great bodily injury enhancement. In a bifurcated proceeding, the trial court found true the prior prison term enhancement. Defendant was sentenced to a total of 9 years in prison, comprised of the 4-year high term for assault with a deadly weapon, plus a consecutive 3 years for the great bodily injury enhancement, plus a consecutive 2 years for the prior prison term enhancement; the high term of 4 years was imposed on the battery conviction, but stayed pursuant to Penal Code section 654. (All future undesignated statutory references are to the Penal Code.)

[2]     To avoid confusion, we refer to mother and daughter by their first names.

apartment, as did defendant.[3] Before falling asleep in the early morning hours of July 22, Fox wondered why defendant and Waynesha were sleeping on the floor in Sherine's room, rather than in Waynesha's own room. The next morning, Fox was awakened by someone pouring boiling hot liquid on his head and upper body. In addition to burn scars, the hot liquid destroyed his left eardrum and injured his left eye. Between the excruciating pain and the injuries to his ear and eye, Fox could at first see only shadows and could not hear. Although he did not see the perpetrator, Fox was sure it was defendant. By the time a neighbor, Anne, called 911, Fox knew that Sherine was with him and he could hear Anne speaking to the 911 dispatcher; Fox identified Sherine's and Anne's voices on the recording of the 911 call, which was played for the jury. Fox was transported by ambulance to a hospital where he was treated for burns to his head, face and arm.

After he was released from the hospital that same day, Fox received a telephone call from defendant, who said, "You'll never touch her again, will you?" Either later that day or the next day (July 23), Fox went to Sherine's apartment to retrieve his bike. While Fox waited on the sidewalk for someone to bring the bike, defendant came onto the porch and said he was keeping Fox's bike because Fox owed him money. Defendant threatened to kill Fox if he ever came back. Fox reported defendant's threats to the police later that night. At the time, Fox only knew defendant by his moniker, "P.K.," but was able to identify defendant from a photograph shown to him by police. Fox told Los Angeles Police Officer Antonio Villegas that defendant had poured hot water on him, but did not tell Villegas he *saw* defendant do it because he had been asleep at the time.

---

**3**      During jury selection on Friday, February 10, 2012, the prosecutor informed the trial court that Fox, who was semi-transient, could not be located. Following an Evidence Code section 402 hearing, the trial court found the People had used due diligence to locate Fox, and allowed Fox's preliminary hearing testimony to be read into evidence. Fox was later located and testified without any objection on the grounds that his preliminary hearing testimony had already been introduced. (See e.g. Evid. Code, § 352.)

When Los Angeles Police Officer Carlo Zaragoza arrived at Sherine's apartment, Fox was already in an ambulance being treated for his injuries. Waynesha told Zaragoza that defendant was jealous that Fox had given Waynesha a massage a few days before. That morning, Waynesha saw defendant preparing water to make noodle soup but instead of making the soup, defendant threw the water at Fox, and then ran out of the apartment.

Waynesha testified that defendant did not sleep at Sherine's apartment the night of July 21. Waynesha was asleep on the floor in Sherine's room when Fox was injured and did not see the attack occur. When she woke up, the ambulance was already there and the only people in the house were Sherine and Anne (the neighbor who called 911), and possibly Braux. Waynesha did not speak to a police officer at the scene. She did not tell him she saw defendant throw boiling water at Fox, Fox try to jump out a window, or defendant run away. Waynesha said she never told Fox that defendant was his assailant.

Sherine told Zaragoza that before Fox was injured, she saw defendant boiling water for noodle soup. A few minutes later, Sherine heard Fox screaming and then saw defendant run out of the apartment. Sherine said that after he was injured, Fox tried to jump out of a window.[4] Zaragoza noticed that one of the apartment windows was broken and he deduced that a laceration on Fox's back was caused by broken glass from that window. At the hospital, Fox told Zaragoza that after he was awakened by the burning on his face, he tried to run through a window. Because he was asleep, Fox did not see the attack occur; he did not have any arguments with anyone, although Sherine had accused Fox of "lusting" after Waynesha. At trial Waynesha and Sherine testified differently than the accounts of their interviews that Officer Zaragoza provided.

---

**4** Sherine testified that she was not home when Fox was injured; she did not tell a police officer at the scene that she saw defendant pour boiling hot water on Fox, heard Fox screaming in pain or saw defendant run out of the apartment. Sherine denied that her voice was on the tape of the 911 call. During his testimony, defendant identified one of the voices on the tape as Sherine's.

4

B.     *The Defense Case*

Defendant testified that he was at Sherine's apartment the evening of July 21, but left at about 10:00 p.m. after getting into an argument with Waynesha. Defendant went with a friend to a bar and then with another friend, Princess, to her place, where he spent the night. He spent the next day, July 22, with Princess and some of her friends. At about 7:00 p.m. on July 22, defendant returned to Sherine's apartment where he relaxed with Waynesha, Sherine and Braux. After Waynesha and Sherine left to pick up some food, defendant took a nap. He woke up to police officers surrounding him and was arrested. Defendant denied pour boiling hot water on Fox; he was not present when Fox was injured or when Fox returned to pick up his bike; he did not threaten Fox; he had no ill feelings towards Fox and knew nothing about Fox giving Waynesha a massage. Defendant did not recall calling Fox and saying, "You will never touch her again, will you?"

Waynesha testified that she slept on the floor in Sherine's room that night because the apartment windows were broken and she was afraid to be alone. Early the next morning, Waynesha was awakened by the sound of the back door opening; she saw Sherine in the kitchen boiling water for laundry and going in and out of the back door with things to hang on the clothes line. Waynesha fell back asleep until screaming coming from the bedroom woke her up. She saw "Keyroy," whom Waynesha knew as a gang member, run out of the bedroom and out the back door. Waynesha and Sherine helped the injured Fox to Anne's apartment; the police were called from there. Neither Waynesha nor Sherine ever talked to the police about what happened. Waynesha falsely told defendant's former defense attorney that she did not know anything about what happened (i.e. about Keyroy) because she did not want to get involved. Keyroy threatened to kill Sherine if they ever implicated him in the attack on Fox.

When defense investigator John Moore interviewed Waynesha about the incident, she told him that Keyroy was at Sherine's apartment on July 21; Waynesha saw Keyroy come in through the back door while Sherine was in the kitchen boiling water for

5

laundry. Waynesha did not say she saw Keyroy run out of the apartment. Moore did not clarify whether Waynesha said she saw Keyroy enter the apartment and saw Sherine boiling water the night of July 21 or the morning of July 22. Waynesha told Moore she was asleep and did not see the attack on Fox, but she saw Fox jump up and run into the window.

## DISCUSSION

Defendant's sole contention on appeal is that the trial court abused its discretion in allowing the prosecution, after it had "rested," to introduce testimony by Sherine, Waynesha, Zaragoza and Fox, without a showing of good cause for the prosecution to reopen its case-in-chief, as required by Penal Code sections 1093 and 1094. Defendant argues that inasmuch as the prosecution made no motion to reopen, it necessarily did not make the requisite showing of good cause. We find no error.

Section 1093, subdivision (c) prescribes the order of proof at trial. First, the prosecution offers evidence in support of the charge. Second, the defendant offers evidence in support of the defense. "The parties may then respectively offer rebutting testimony, only, unless the court, for good reason, in furtherance of justice, permit them to offer evidence upon their original case." (§ 1093, subd. (d).) "[F]or good reasons, and in the sound discretion of the court, the order prescribed in Section 1093 may be departed from." (§ 1094.) In *People v. Katz* (1962) 207 Cal.App.2d 739, 750, the court explained that after the defense has introduced its evidence, the prosecution is limited to introducing only rebuttal evidence, unless the prosecution shows good cause for reopening its case-in-chief. Thus, it is the fact that the prosecution has finished putting on its case-in-chief and the defense has begun introducing its evidence that triggers application of the Penal Code section 1093, subdivision (c) limitation on the prosecution's introduction of new (as opposed to rebuttal) evidence. As we shall explain, the section 1093, subdivision (c) limitation on introduction of new evidence in the prosecution's case-in-chief was not triggered when, during Villegas's testimony, the prosecutor indicated Villegas would be his last witness.

6

When the trial started, witnesses Sherine and Waynesha had not been located. Defendant had requested a body attachment for Waynesha. On Wednesday, February 15, while Villegas (the officer who took Fox's police report on July 23) was still testifying, the trial court asked whether Villegas would be the People's last witness. Following the prosecutor's affirmative response, the trial court told the jury, "We're going to adjourn for the day. The People *probably* are resting subject to this little discussion we have to have. . . . [¶] . . . The People have rested and we'll see about the defense witnesses. So we will finish this week. . . . I don't know what's going to happen tomorrow." (Italics added.) Outside the presence of the jury, following a discussion of some evidentiary issues, the trial court told defendant that after Villegas was done, defendant would have to start putting on his witnesses.

But by the next day (February 16), the defense investigator had found Sherine and Waynesha, and brought them to court. At the prosecutor's request, the trial court ordered them to remain as witnesses for the People. When Villegas finished testifying later that day, there ensued the following colloquy:

> "THE COURT: . . . Call your next witness. [¶] [THE PROSECUTOR]: Yes. We would call A – [¶] [THE DEFENDANT]: I thought he rested. [¶] THE COURT: No, he didn't. [¶] [THE DEFENDANT]: He did rest yesterday. I remember, he rested. [¶] THE COURT: Thank you, Mr. Canister. [¶] [THE DEFENDANT]: I know what resting is. [¶] THE COURT: He's going to have a few more witnesses. [¶] Let's move on. [¶] [THE DEFENDANT]: I would like an offer of proof of any witnesses that he agrees to call. [¶] THE COURT: Be quiet. Call your next witness."

The prosecution called Sherine as its next witness. It then called Fox, who evidently had also been located in the interim.[5] The next day (February 17), the prosecution re-called Zaragoza, then called Waynesha, and then re-called Zaragoza again, before announcing that the People had no additional witnesses.

---

[5] Defendant did not object to Fox's live testimony on the grounds that his preliminary hearing testimony had already been read into the record, and does not argue the issue on appeal.

Thus, the record is clear that the prosecution had not finished questioning Villegas when the prosecutor indicated, on February 15, that Villegas would be the People's last witness.[6] Accordingly, notwithstanding the trial court's statements to the jury and to defendant, the prosecution had not "rested" its case-in-chief since it's witness, Villegas, was still testifying and defendant had not begun putting on his case. Thus, when Sherine, Waynesha and Fox unexpectedly appeared in court the next day, the prosecution had the right to introduce their testimony in its ongoing case-in-chief pursuant to section 1093, subdivision (b). Section 1093, subdivision (c), requiring the trial court to find good cause to allow the prosecution to introduce additional evidence, had not been triggered because defendant had not begun putting on his own case. There was nothing to reopen, and the trial court was under no duty to exercise section 1093 discretion.

## DISPOSITION

The judgment is affirmed.

RUBIN, ACTING P. J.

WE CONCUR:


FLIER, J.                                        GRIMES, J.

---

[6] In his Reply Brief, defendant argues that, because the prosecutor had already completed direct and redirect examination of Villegas, the prosecution's case-in-chief was not ongoing when the prosecutor indicated Villegas would be his last witness. Defendant is incorrect. The facts are that defendant was in the process of cross-examining Villegas when court recessed on February 15. The prosecutor redirected additional questions to Villegas on February 16, followed by more cross-examination by defendant. But even if the prosecutor had elected not to ask additional questions on February 16, the fact that defendant's cross-examination of the witness was still on-going meant that the prosecution's case-in-chief was, too.