Filed 11/19/24 P. v. Hoang CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHAM HOANG,<br><br>    Defendant and Appellant. | 2d Crim. No. B323124<br>(Super. Ct. No. BA250401)<br>    (Los Angeles County) |

   Cham Hoang appeals the trial court's order denying his Penal Code section 1172.6[1] petition for resentencing. After an evidentiary hearing, the trial court found that appellant could be convicted of second degree, implied malice murder under current law on the theory that he directly aided and abetted the stabbing of the victim, Binh Huynh. Appellant contends the order is not supported by substantial evidence. He contends in the alternative that the matter should be remanded with directions

---

   [1] All statutory references are to the Penal Code unless otherwise stated.

for the trial court to consider the impact of his youth at the time of the offense. We affirm.

*Facts*

Like the parties and the trial court, we take the statement of facts from our unpublished opinion affirming the convictions of appellant and his co-defendants. (*People v. Phoutthachak, et al.,* (Oct. 13, 2005, B177080) [nonpub. opn.].)

Defendant Hoang and his co-defendants were all members of the Black Dragon gang. Nancy Phang was the girlfriend of Hoang. She was also friends with Binh Huynh (the victim), whom Hoang did not like. On December 14, 2002, Phang went to the Oiwake restaurant with the victim and some other friends while Hoang attended another party with co-defendants. Hoang spoke to Phang on the telephone after leaving the party and seemed unhappy that she was with the victim and his friends.

The victim went outside to the stairwell of a parking structure adjacent to the restaurant to make a call on his cell phone. David Hang was smoking a cigarette on another landing of the stairwell and saw three Asian males approach from the other side of the parking structure. One of them said, "Where are you from?" Hang said, "Nowhere," and the other man replied, "Black Dragon." The three men then went down the stairs to the area where the victim was sitting.

Hang was joined by two friends. They heard a "commotion" from the stairwell, which included the sound of "flesh hitting flesh." One of the witnesses looked down and saw two men hitting the victim while the other one held the door to the stairwell shut. The other stood on the same level as the victim, striking and kicking him. The person who was holding

2

the door shut walked over and kicked the victim from above and behind.  Alva Argonza saw that one of the men was hitting the victim with a closed fist in the back of the neck and behind the right ear.

The witness yelled at the attackers to stop and ran down the stairs.  One of them ran up the stairs and pushed him against the rail.  The other two attackers followed and the three fled the area.  One of them again claimed, "Black Dragon" as they passed the witness.  Alva Argonza ran back into the restaurant to call 911.  The victim, who had been stabbed several times, was taken to the hospital and later died from his wounds.  At trial, the witness identified Hoang and Phoutthachak as participants in the attack.

On the night of the stabbing, defendant Hoang went to the home of A.T., a Black Dragon gang member who, unbeknownst to Hoang, was working as an informant for the FBI.  Hoang told A.T. that someone has been stabbed and that a few months ago he and Nancy Phang had argued over a man she had been talking to on the phone.  Phang called Hoang on his cell phone while Hoang was still at A.T.'s.  Hoang told Phang, "I did it. I did it. Don't worry about it."

Hoang then went to the home of Viet Pham, a friend who was also a member of the Black Dragon gang.  He told Pham that he had gotten into a fight with Nancy Phang, who was at a Japanese drinking place with a man he did not like.  Hoang said he went to the drinking place with co-defendants Phoutthachak and Le to "kick [the victim's] ass."  He found him on the stairwell and kicked him while Phoutthachak stabbed him.  Hoang said there had been a lot of blood and the victim might die.  Pham's girlfriend, Stacy Nguyen, surreptitiously listened to his

3

conversation. While still at Pham's house, Nancy Phang sent defendant Hoang a text message on her cell phone saying, "You fucked up. He's dead."

The next morning, the defendants met with Pham at defendant Le's house. Hoang said to Phoutthachak, "Fuck, Tony, I didn't know you were like that." Phoutthachak responded, "Fuck, I was drunk. I couldn't sleep." Le said, "Damn, you know I didn't do nothing. Damn." The four of them discussed getting rid of the knife used in the attack and later retrieved it and threw it in a gutter.

Pham later told Stacy Nguyen what had happened. Nguyen saw Nancy Phang at a club a few weeks later and discussed the attack with her. Phang confronted Hoang, who denied being involved in the stabbing. Hoang and another associate went to Nguyen and Pham's home, where he put a gun to Nguyen's head and threatened that he would kill her. He struggled with Pham, who was trying to separate them, saying, "You fucked up. You snitched a homeboy out. You [chose] bitches over homies." After making several other threats, Hoang and his associate left. Pham and Nguyen moved away from California a couple of days later.

S.Y. was another Black Dragon gang member who had been recruited by the FBI to provide information about the gang in exchange for living expenses and protection. The defendants did not know that S.Y. was an informant and had several conversations were surreptitiously recorded with a body recorder.

Defendant Hoang told A.T. that he had gone to the home of Viet Pham and Stacy Nguyen with a couple of homeboys and that he had "socked" Pham. He said he did this because

4

Pham had told Nguyen about the stabbing. Hoang told S.Y. that he, Phoutthachak and Le had gone to Japan Town to meet the victim and had found him in the stairwell. Hoang said he had kicked the victim while Phoutthachak pulled out a knife and started stabbing him.

Defendant Phoutthachak told A.T. that he had not known the victim but had gone to the restaurant with Hoang. He, Hoang and Le "bombed" the victim as he sat on a stairwell and then he (Phoutthachak) brought out a knife and stabbed the victim. Hoang did not tell him to stab the victim. Le kicked the victim a couple of times. Phoutthachak told S.Y. that before they had arrived at the restaurant, Hoang pulled out a shank and asked who wanted to use it. Phoutthachak took the knife. When they saw the victim, Hoang rushed at him, boxing and fighting. The victim struck Phoutthachak and Phoutthachak pulled out the knife and stabbed him. Phoutthachak said that defendant Le "busted a dou-ma kick," "dou-ma" being Vietnamese for "fucking."

Defendant Le told A.T. that he had been present when the victim was killed. He initially denied doing anything, but then said he had kicked the victim. Le told S.Y. that he did not know why it happened and he "didn't even do shit." He said that before they had left the car, Hoang had taken out a knife and asked who wanted to use it.

Defendant Phoutthachak spoke to Jonathan Nandee about a month after the stabbing and said that defendant Le had not done anything during the attack. Phoutthachak appeared upset by Le's lack of participation.

*Procedural History*

In 2004, appellant was convicted, by jury, of second degree murder, two counts of dissuading a witness by force or

5

threat, and two counts of assault with a firearm. (§§ 187, 136.1, subd. (c)(1), 245, subd. (b).) The jury further found appellant committed these offenses for the benefit of a criminal street gang and that he personally used a firearm during the commission of the latter four offenses. (§§ 186.22, subd. (b), 12022.5, subd. (a).) We affirmed the convictions in an unpublished opinion. (*People v. Phoutthachak, supra,* B177080.)

Appellant filed his petition for resentencing in August 2020. The trial court appointed counsel to represent him and obtained a response from the prosecution. At the evidentiary hearing, the parties relied on the record from the original trial rather than presenting any additional evidence. The trial court denied the petition, finding that, under current law, appellant could be convicted of directly aiding and abetting second degree, implied malice murder.

*Discussion*

At an evidentiary hearing on a petition for resentencing under section 1172.6, the trial court is required to decide whether the prosecution has carried its burden to prove beyond a reasonable doubt that the defendant could be convicted of murder under current law. (*Id.*, subd. (d)(3).) In making that determination, the trial court sits as an independent trier of fact. (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 123; *People v. Schell* (2022) 84 Cal.App.5th 437, 442 (*Schell*).)

We review the trial court's factual findings for substantial evidence. (*Schell, supra*, 84 Cal.App.5th at p. 442.) This requires us to "review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence." (*People v. Zamudio*

6

(2008) 43 Cal.4th 327, 357; see also *People v. Didyavong* (2023) 90 Cal.App.5th 85, 97-98.)  We do not make credibility determinations or resolve evidentiary conflicts.  (*Schell, supra,* at p. 442.)

Section 1172.6 reflects a legislative intent "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life."  (Stats., 2018, ch. 1015, § 1, subd. (f).)  To that end, the statute provides a procedure for resentencing persons convicted of murder where, among other things, the person "could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019."  (§ 1172.6, subd. (a)(3).)  The theory of second degree, implied malice murder remains valid after the recent amendments to sections 188 and 189.  (*Schell, supra,* 84 Cal.App.5th at p. 442; §§ 187, subd. (a), 188, subd. (a).)

A murder is committed with implied malice when "'the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another who acts with conscious disregard for life.'"' [Citation.]" (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)  To directly aid and abet an implied malice murder, the aider and abettor "must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.  The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in

7

conscious disregard for human life." (*People v. Powell* (2021) 63 Cal.App.5th 689, 713, emphasis in original.)

According to appellant, the life-endangering act here is Phoutthachak's stabbing the victim. He contends there is not substantial evidence that he directly aided and abetted the stabbing or had the requisite mental state because he did not instruct Phoutthachak to stab the victim. In addition, when appellant initially gave Phoutthachak the knife, they did not know they would find the victim alone, outside the restaurant, isolated from people who might have defended him. Appellant contends Phoutthachak acted suddenly and spontaneously, and there is no evidence that appellant had reason to anticipate the stabbing or did anything to facilitate it.

In *Schell,* at least eight gang members attacked the victim, stabbing him and beating him with a baseball bat, a shovel and their fists and feet. The appellant was convicted of second degree murder, based on evidence that he participated in the attack by hitting and kicking the victim. We held that his section 1172.6 petition for resentencing was properly denied because there was substantial evidence supporting the trial court's finding that the appellant directly aided and abetted a second degree, implied malice murder. "Appellant's presence at the scene, his participation in the attack on the victim, his companionship with other perpetrators, his conduct before and after the crimes, and his motive of retaliation for disrespect all support the finding that he aided and abetted an implied malice murder." (*Schell, supra,* 84 Cal.App.5th at p. 443.)

The same reasoning applies here. Appellant was present at the scene of the murder and participated in it by supplying the murder weapon and by striking and kicking the

8

victim while the stabbing was occurring.  The three perpetrators were members of the same gang who traveled together to the scene of the murder.  Appellant supplied the knife to his subordinate in the gang after being assured that the subordinate was willing to use it.  He later admitted to another gang member that he went to the parking structure to attack the victim. He also told his girlfriend, "I did it. I did it. Don't worry about it . . . . If anybody asks, tell them I did it."  All of this evidence supports the trial court's finding that appellant aided and abetted a second degree, implied malice murder.

*Reyes* is fully consistent with this result.  There, our Supreme Court applied *Powell* and held that a trial court erred in denying a section 1172.6 petition because it misunderstood "the legal requirements of direct aiding and abetting implied malice murder." (*Reyes, supra,* 14 Cal.5th at p. 992.)  The Court explained, "implied malice murder requires attention to the aider and abettor's mental state concerning the life endangering act committed by the direct perpetrator, such as shooting at the victim.  [Citation.]  Here, assuming the life-endangering act was the shooting, the trial court should have asked whether [the defendant] knew that [the shooter] intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life.  [Citation.]  Because the court did not do so, its decision was based on an error of law insofar as the court sustained Reyes's murder conviction on a direct aiding and abetting theory." (*Ibid*.)

Here, there can be little doubt that appellant knew Phoutthachak had the knife and intended to use it.  He gave Phoutthachak the knife after asking which one of his

9

subordinates wanted to use it.  Similarly, there is little question appellant intended to aid in the stabbing.  He persuaded his fellow gang members to join him in looking for the victim.  When they located the victim, appellant initiated the assault.  He also helped to prevent the victim from defending himself by hitting and kicking the victim during the stabbing.

Appellant next contends the trial court's order should be reversed and the case remanded with directions for the trial court to consider the impact of appellant's youth on his conduct and mental state.  We conclude the contention has been forfeited because appellant did not raise it in the trial court.  (*People v. Saunders* (1993) 5 Cal.4th 580, 589-590.)  Since at least 2021, courts have held that a defendant's age at the time of the offense is a relevant factor to consider in determining, for purposes of a section1172.6 resentencing petition, whether the defendant personally harbored the mental state required for a conviction under current law.  (*People v. Harris* (2021) 60 Cal.App.5th 939, 960.)  While these cases arose in the context of felony murder, the question with regard to implied malice murder is essentially the same:  whether the defendant's youth prevented him from forming the requisite mental state.  (*People v. Pittman* (2023) 96 Cal.App.5th 400, 416-417 (*Pittman*).)  We conclude appellant was on notice that youth was a relevant consideration and could have raised the issue in his petition for resentencing.  His failure to do so forfeits the issue.

Had the contention been preserved for review, we would reject it because there is no reasonable probability consideration of appellant's youth would have impacted the trial court's decision on his resentencing petition.  (*Pittman, supra,* 96 Cal.App.5th at pp. 417-418.)  Youth is relevant to criminal

10

defendants' culpability in two areas, the youthful offenders' "'relative impulsivity' and 'their vulnerability to peer pressure.' [Citation.] "'[T]ransient rashness,'" ""impetuosity"", and ""failure to appreciate risks and consequences"" are hallmarks of an immature brain." (*Id.* at p. 418.) While youth may be relevant to the question of whether a defendant formed the required mental state, it "cannot overwhelm all . . . factors." (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 595.)

The circumstances of the offense here do not suggest that appellant acted impulsively or was vulnerable to peer pressure. Instead, appellant planned the attack and purposefully recruited two subordinate gang members to join him. If peer pressure played any role in this offense, appellant was the person applying it, not the person who was subjected to it. He supplied the murder weapon and led the search for the victim. Once they located the victim, appellant initiated the attack on him. He also helped to prevent the victim escaping or defending himself by kicking and striking the victim while he was being stabbed. Under these circumstances, it is not reasonably probable the trial court would have granted appellant's petition had the court considered his age at the time of the offense.

*Conclusion*

The order denying the petition for resentencing is affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.

We concur:


GILBERT, P. J.                    BALTODANO, J.


11

Larry P. Fidler, Judge

Superior Court County of Los Angeles

_____

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Seth P. McCutcheon, Christopher G. Sanchez, Chelsea Zaragoza, Deputy Attorneys General, for Plaintiff and Respondent.